## COOPER v. FLESNER *et al.*

No. 2211, Okla. T. Opinion Filed May 15, 1909.

(103 Pac. 1016.)

1. **TRIAL—Directing Verdict—Procedure.** The question presented to a trial court on a motion to direct a verdict or which presents itself in the consideration of such action on its own motion is whether, admitting the truth of all the evidence which has been given in favor of the party against whom the action is contemplated, together with such inferences and conclusions as may be reasonably drawn from it, there is enough competent evidence to rea-

sonably sustain a verdict should the jury find in accordance therewith. Where the evidence is conflicting and the court is asked or on its own motion considers the direction of a verdict, all facts and inferences in conflict with the evidence against which the action is to be taken must be eliminated entirely from consideration, and totally disregarded, leaving solely the evidence for consideration which is favorable to the party against whom such action is leveled.

2.　ESTOPPEL—Pleading. An estoppel must be pleaded in order to enable a party to avail himself of it on the trial, and must be pleaded with particularity in order to constitute either a cause of action or defense. No intendments are indulged in favor of such plea, but it is incumbent upon the party pleading to aver all the facts essential to its existence.

3.　VENDOR AND PURCHASER—Notice—Records—Destruction. Where a deed has been once recorded, a subsequent burning or other destruction of the records will not render the same ineffectual as notice to subsequent purchasers.

4.　VENDOR AND PURCHASER—"Actual Notice." The words "actual notice" do not always mean in law what in metaphysical strictness they import. They more often mean knowledge of facts and circumstances sufficiently pertinent in character to enable reasonably cautious and prudent persons to investigate and ascertain as to the ultimate facts.

5.　VENDOR AND PURCHASER—Bona Fide Purchaser—Notice. One who purchases land with knowledge of such facts as would put a prudent man upon inquiry, which, if prosecuted with ordinary diligence, would lead to actual notice of rights claimed adversely to his vendor, is guilty of bad faith if he neglects to make such inquiry, and is chargeable with the "actual notice" he would have received.

(Syllabus by the Court.)

*Error from the District Court, Payne County; John H. Burford, Judge.*

Action by Lou Cooper against Gerd Flesner and others. Judgment for defendants, and plaintiff brings error. Reversed and remanded.

The plaintiff in error, who was plaintiff below, began her action in the district court of Payne county against Gerd Flesner and others to have adjudged and decreed to her an undivided one-half interest in and to the E. ½ of the S. E. ¼, section 8, and the W. ½ of the S. W. ¼ of section 9, in township 19 N.,

range 2 E., of the Indian meridian, Payne county Okla., and have her declared to be entitled to the common possession of the premises with the said defendant during the years from 1901 to 1907, inclusive, and praying an accounting for the value of the use and occupancy of the premises during said time; also asking for partition of the same. To this petition the defendant filed an answer denying all of the averments of the petition, except that he was in the actual and sole possession of the land. A trial of the cause was had to a jury, and at the conclusion of the evidence of both parties the court instructed the jury to return a verdict for the defendant, which was accordingly done, and, on judgment being rendered thereon, plaintiff took the case to the Supreme Court of the Territory of Oklahoma by proceedings in error, and the same now comes to us for review by virtue of our succession to that court.

The controversy grows out of the following facts: George W. Gardenhire on the 1st day of December, 1890, commuted on the tract of land in controversy, and on the 2d day of March, 1891, made a warranty deed to the same to his son, Clide, who on March 24, 1891, executed a warranty deed to the same tract of land to William G. Scott, who, plaintiff alleges, prior to the 9th day of December, 1895, executed and delivered a warranty deed to Jacob Gardenhire, her husband, to whom she was married on the 20th day of September, 1894, and who died on or about January 5, 1895. It is plaintiff's claim that this warranty deed was duly recorded, but that the record of the same was destroyed at the time of the destruction of the courthouse of Payne county by fire on December 27, 1894, and that the original deed she was unable to find or produce. On January 7, 1895, William G. Scott executed and delivered to George W. Gardenhire a quitclaim deed which was duly filed for record with the register of deeds of Payne county, March 15, 1898. On November 20, 1899, George W. Gardenhire made, executed, and delivered to the defendant Flesner his bond for a deed to this tract of land for a consideration of $3,500, $700 of which was duly paid in cash at

the time of the execution and delivery of the said bond, and Flesner in March following took actual possession of the tract of land, and on May '16, 1901, received from George W. Gardenhire a warranty deed for the tract, having paid in full the consideration agreed upon. The next payment made after the $700 payment was on the 15th day of January, 1901. At the time of Jacob Gardenhire's death he was without issue and left surviving him his wife and father, so that under our law of descent and distribution they would each inherit a one-half interest in this land, provided the conveyance contended for could be established, and evidence thereof being in such a condition as to charge Flesner with knowledge or notice. At the time Flesner purchased he was not a resident of Payne county, and was virtually a stranger therein. He made, however, several trips to the vicinity of Stillwater before finally coming to an agreement with his grantor and moving on the land.

The testimony adduced by plaintiff is to the effect that on one of defendant's visits to that vicinity in January or February, 1900, he stopped at the home of Louis M. Cooper, the father of plaintiff's present husband, who lived about three-quarters of a mile from the land in controversy. Mr. Cooper testified in answer to interrogatories as follows in reference to what he told him about plaintiff's claim of right and interest in and to the land involved:

"Q. Now, this day that Mr. Flesner and Mr. Shaffer was at your house, you say Mr. Flesner said something about buying this east half of the southeast of 8, and the west half of the southwest of 9, the old Gardenhire land, or the Jake Gardenhire land. You may state to the jury what he said about it. A. Well, he came there and called for dinner, as I stated, rather late. We had our dinner, and I told him we never turned any one off, and, if he would wait until my wife could fix dinner, he could have his dinner. While he was sitting there eating dinner he told his business, said he was around looking up a location, and wanted to · buy a farm and wanted to know if I knew of any. Well, I knew of several farms for sale, but I don't know that I named the Gardenhire place. He said, though, he was stuck on the Gardenhire place. Q. He told you that? A. Yes, sir, and I asked him: 'For

why ?' He said it was close to the college, close to school, and he believed he would like to own it. 'Well, now,' I says, 'you are a stranger in the neighborhood, and my advice would be to let that farm alone'; that George Gardenhire didn't own it, that if he bought it he would buy trouble; that Jake's widow had married into my family, married one of my sons, and some day they would commence suit for her rights. Well, they asked the question then if there was any heirs, and I told him no. Well, he said then he wasn't afraid to buy it, and I told him the way I understood the statute she was entitled to one-half of the land, and he said, 'No,' she wasn't entitled to nothing. 'Well.' I says, 'that is your opinion, and my opinion is the other way, but my advice would be to let it alone, and not buy it, for you will buy a lawsuit if you do.' Q. What, if anything, did you say to Flesner about Jake having a deed to that land at any time? A. Well, I told him how the thing happened— Q. Just go on and tell fully to the jury that conversation with him. A. I don't know as I could tell it all. Q. Tell the jury all you remember you said to him. A. I told him Mr. George Gardenhire had told me he had deeded the farm away, and Mr. Scott told me also he had deeded it to Jake Gardenhire, and Jake Gardenhire told me also he had a deed for it, it was his, and asked me what I thought about the trade, in exchanging his farm directly north for that. 'Well,' I says, 'I don't know how you traded, but I think you made a good trade, a good exchange.' 'Well,' he says, 'I did that, and got a deed for it.' Q. You told Mr. Flesner that, did you? A. Yes, sir; I did tell him that to keep him out of trouble, because I didn't want any trouble in my family, and didn't want him to buy it, or any other stranger."

This testimony is corroborated to a considerable degree by the witness's son and his wife, who testified that they were present and heard it. The defendant Flesner testified that he did not so remember this conversation. In answer to questions on cross-examination, he testified as follows:

"Q. You don't remember of anything further being said until Mrs. Cooper stepped into the room? What did she say then? A. Why, she said, as she was walking in, I think it was with a dish of fruit, she said, addressing rather Mr. Cooper, as I took it and his answer to her question, says: Is this the old George's place they are talking about? Q. Then what did you say, or what

did Cooper say? A. He says: 'Oh, no; this man wouldn't buy that, for that is in litigation.' I am sure he used the word 'litigation.' Q. Cooper said, 'Oh, no, this man wouldn't buy that because that is in litigation?' A. Yes, sir. Q. And that is all that was said about the place? A. That is all I recollect being said."

And to interrogatories propounded to him by the court in reference to this matter, as follows:

"Q. Do you say now—I don't remember whether you did or not—that at the time you were there at the Cooper's that neither Mr. Cooper or Mrs. Cooper made any statement to you of a claim that the Jake Gardenhire widow was making to the land? A. No, sir; they did not. Q. Never mentioned it to you at all? A. No, sir. Q. Didn't make any statement to you that you would get into trouble by buying the land, or have a lawsuit over it? A. No, sir. Q. Nothing of that kind mentioned? A. No, sir."

Of course, the foregoing evidence would be of no materiality except it was predicated upon a showing that Jacob Gardenhire had received a prior deed to the tract of land in controversy. On this question the deposition of William G. Scott was taken. He was a resident of Kansas, and testified: That Clide Gardenhire had executed to him a deed to a tract of land in reference to which he said, a year or two afterward, "I deeded it to Jacob Gardenhire, I think so," and that he never made but one deed to the land. That after Jake's death, being informed by George Gardenhire that the records were burned or destroyed, he signed with him as a witness, but he did not know what it was he signed. (It later developed that this was a quitclaim deed.) That the place on which Jake died was the one he supposed he deeded to him. That he thinks it was the next day after Jake was buried that he signed the paper that he signed after Jake's death. That he received no consideration for the same. That the deed which he made to Jake was made before Mrs. Caldwell, a notary public at Wilmont, Kan. On cross-examination he testified he never signed but one deed, and that was to Jake. The same witness's deposition was also taken by the defendant. He was interrogated, and asked if he was acquainted with the land in controversy, and he stated that he had seen it, and that it had been deeded to him·

by Clide Gardenhire, and the deed was handed to him by George Gardenhire; that he did not pay anything for the deed; that he afterwards deeded the land to George Gardenhire, receiving no consideration therefor; that he did not know that the deed he made to Jake Gardenhire was for the same land that was in controversy in this suit.

A witness by the name of Zoe Lahar was also called, who testified: That she was living adjoining Jake Gardenhire's place on the east in 1894, and that she saw in his possession a paper purporting to be a deed, which she examined. That the grantor was W. E. or W. G. Scott, and that it conveyed title to Jacob Gardenhire. That it was a warranty deed acknowledged before an officer, whose character she was unable to definitely assert, except that there was a seal attached to the deed; also, that it was not made in Stillwater, but was made in Kansas, and that the consideration named in the deed was $900. In reference to the recording of it she answeres to interrogatories as follows:

"Q. Did you examine that deed to see whether there was any certificate of record on it or not? A. Yes, sir. Q. You may state what you found on the deed. A. The deed was recorded. Q. Was there anything calling your attention particularly at that time to the fact that the deed was recorded? A. Yes, sir. Q. You may state what it was. A. Well, shall I tell what brought up the conversation? Q. Yes. A. Mr. Gardenhire was taking the deed down to put it in the bank, and I told him he ought to have it recorded before he put it in the bank. If anything happened, then he could get a copy of it, that that is the way we did ours, and he says— (Objected to as hearsay, which objection was by the court sustained.) Q. And did you at that time notice to see it was recorded? A. Yes, sir."

That the description given in the deed involved land in section 8 and 9, adjacent to the property where she lived, and that she lived on land right east of Jake Gardenhire's land. That, when she examined the deed, she noticed that it conveyed the farm that Jake was living on. It is in evidence that he occupied the land for several years before he died.

It is further admitted by the parties in the record that the

tract of land in controversy here was the only land Scott ever had title to in that township. The courthouse and records of Payne county were destroyed by fire December 27, 1894. This action was begun July 25, 1905.

. *Lowry & Lowry,* for plaintiff in error, citing: Wilson's Rev. & Ann. St. §§ 888, 2788, 2789, 2790; Wade on Law of Notice, §§ 3, 4, 5; *Shannon v. Hall,* 72 Ill. 354.

*Geo. P. Uhl,* for defendants in error, citing: *Weber v. Morse* (Tex.) 21 S. W. 609; *Stanley v. Schwalby,* 162 U. S. 255, 276.

. DUNN, J. (after stating the facts as above). On the situation presented, of which the foregoing recitals constitute a substantial statement, the learned trial judge directed the jury to return a verdict for the defendant. Having the printed record before us, with opportunity for comparison, study, and reflection, supplemented by investigation, we are led to the conclusion that the facts and testimony set forth therein are sufficient to require a submission of the case to a jury. The question presented to a trial court on a motion to direct a verdict or which presents itself in the consideration of such action, on its own motion, is whether, admitting the truth of all of the evidence which has been given in favor of the party against whom the action is contemplated together with such conclusions as may be reasonably drawn from it, there is enough competent evidence to reasonably sustain a verdict, should the jury find in accordance therewith. Where the evidence is conflicting and the court is asked or on its own motion considers the direction of a verdict, all facts and inferences against or in conflict with the evidence against which the action is to be taken must be eliminated entirely from consideration, and totally disregarded, leaving solely the evidence for consideration which is favorable to the party against whom such action is leveled, *Baker v. Nichols & Shepard Co.,* 10 Okla. 685, 65 Pac. 100; *Richardson et al. v. Fellner,* 9 Okla. 513, 60 Pac. 270; 6 Encyclopedia of Pleading & Practice, p. 693. The same rules obtain in the direction of a verdict as obtain on a demurrer to the evidence

6 Encyclopedia of Pleading & Practice, p. 692. And in the case of *Conklin v. Yates et al.,* 16 Okla. 266, 83 Pac. 910, the Supreme Court of the Territory of Oklahoma held that upon a demurrer to the evidence the court must consider as true every portion of the evidence tending to prove the case of the party resisting the demurrer. See, also, *Edmisson v. Drumm-Flato Company,* 13 Okla. 440, 73 Pac. 958, in which case Chief Justice Burford, on stating the rule which we have just noted, made a general collation of authorities to sustain it. There is probably no difference as to the rule. The conflict in the case at bar arises out of our inability to concur in the conclusion to which the trial court arrived in considering the evidence. In coming to this conclusion, of course, we do not mean to express any opinion upon the truth or falsity of the evidence produced, nor to make any intimation upon which an argument could be predicated that a jury should accept the same as true. We merely mean to assert as we have endeavored to state that on directing a verdict the party against whom it is leveled is entitled to have his evidence considered for the purpose as true and uncontradicted. This conclusion on our part necessarily carries with it a finding that on some one or all of the positions asserted by plaintiff, if true, she is entitled to recover, and we will briefly examine them.

First, assuming, as the testimony tends to show, a deed was executed by Scott to plaintiff's deceased husband, and the same was recorded, then the fact that the records were destroyed in no wise affects the notice which defendant was compelled to take had the records not been destroyed The party taking his deed to the register of deeds' office and having it recorded did all that was required of him.

Mr. Wade in his work on the Law of Notice ([2d Ed.] section 157) says:

"It has also been decided that, where the deed has been once recorded, a subsequent burning or other destruction of the records will not render the same ineffectual as notice to subsequent purchasers."

See, also, *Geer et al. v. Missouri Lumber & Mining Company et al.*, 134 Mo. 85, 34 S. W. 1099, 56 Am. St. Rep. 489; *Ashburn v. Spivey*, 112 Ga. 474, 37 S. E. 703; *Alvis v. Morrison*, 63 Ill. 181, 14 Am. Rep. 117.

The force of this rule was broken in the mind of the trial court by reason of the fact that the plaintiff had permitted her claim of interest in and to the land to lie unasserted and without record from the date of the destruction of the courthouse to the date of the bringing of this action, thereby, it was assumed, estopping herself from asserting her claim to the land in the face of a purchaser in good faith for value, whose title was predicated upon an apparently clear record. We question much whether the defendant in this cause was entitled, as the record is presented, to have interposed in his behalf against the assertions of plaintiff the doctrine of an equitable estoppel. Estoppel is an affirmative defense to be specially and specifically pleaded. Such is the holding in the cases of *Holt v. Holt*, decided this session, 23 Okla. 639; *Deming Investment Co. v. Shawnee Insurance Co.*, 16 Okla. 1, 83 Pac. 918, 4 L. R. A. (N. S.) 607; *Tonkawa Milling Co. v. Town of Tonkawa et al.*, 15 Okla. 672, 83 Pac. 915; *Troyer et al. v. Dyar, Commissioner of Drainage*, 102 Ind. 396, 1 N. E. 728; *Sharon v. Minnock*, 6 Nev. 677 So far as the record discloses, the defendant Flesner would not have been in any particular deterred from taking identically the same course which he did had he had full and complete knowledge of the claims of plaintiff and knew that she intended asserting them. If not, then it was incumbent upon him to assert it, and to aver that the failure of plaintiff to do some act or perform some duty had caused him to act differently than he otherwise would. We do not consider or pass upon the question of plaintiff's failure constituting an estoppel, nor any of its effects should it ultimately be found. We do not regard it as being in the case. On another trial of this cause defendant, if he elects and can do so, should be permitted to amend his answer, and set up the plea of estoppel upon which to predicate proof of the same. If the deed was

not recorded, or the same thing, if plaintiff is unable to show it was to the satisfaction of a jury, then the question of notice will be involved.

· Section 12, c. 16, par. 888, under the title "Conveyances of Real Estate," Wilson's Rev. & Ann. St. 1903, provides:

"Except as hereinafter provided, no acknowledgment or recording shall be necessary to the validity of any deed, mortgage, or contract relating to real estate as between the parties thereto; but no deed, mortgage, contract, bond, lease, or other instrument relating to real estate, other than a lease for a period not exceeding one year and accompanied by actual possession, shall be valid as against third persons unless acknowledged and recorded as herein provided; except, actual notice to such third persons shall be equivalent to due acknowledgment and recording."

Our statutes defining notice are found in chapter 28, entitled, "Definitions and Provisions," Wilson's Rev. & Ann. St. 1903, §§ 9-13 inclusive, which are as follows:

"Sec. 9.   Good faith consists in an honest intention to abstain from taking any unconscientious advantage of another, even through the forms of technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious.

"Sec. 10.   Notice is either actual or constructive.

" Sec. 11.   Actual notice consists in express information of a fact.

"Sec. 12.   Constructive notice is notice imputed by the law to a person not having actual notice.

"Sec. 13.   Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, and who omits to make such inquiry with reasonable diligence, is deemed to have constructive notice of the fact itself."

The question which then presents itself is: Was the information which plaintiff contends was given defendant at the time of his visit to the Cooper home in January or February, 1900, given, and if so was it either actual or constructive notice? It will be observed that section 13, *supra,* charges every person with constructive notice of the fact itself when, having actual notice of

circumstances sufficient to put a prudent man upon inquiry, he omits to make such inquiry with reasonable diligence.

In the case of *Williamson v. Brown,* 15 N. Y. 354, the Court of Appeals of New York dealing with this question, speaking through Justice Selden, said:

"Notice is of two kinds—actual and constructive. Actual notice embraces all degrees and grades of evidence from the most direct and positive proof to the slightest circumstance from which a jury would be warranted in inferring notice. It is a mere question of fact, and is open to every species of legitimate evidence which may tend to strengthen or impair the conclusion. Constructive notice, on the other hand, is a legal inference from established facts, and, like other legal presumptions, does not admit of dispute. 'Constructive notice,' says Judge Story, 'is in its nature no more than evidence of notice, the presumption of which is so violent that the court will not even allow of its being controverted.' Story's Eq. Juris. § 399. A recorded deed is an instance of constructive notice. It is of no consequence whether the second purchaser has actual notice of the prior deed or not. He is bound to take, and is presumed to have, the requisite notice. So, too, notice to an agent is constructive notice to the principal; and it would not in the least avail the latter to show that the agent had neglected to communicate the fact. In such cases the law imputes notice to the party whether he has it or not. Legal or implied notice, therefore, is the same as constructive notice, and cannot be controverted by proof."

This question is also elaborately treated by the Supreme Court of Wisconsin in the case of *Brinkman v. Jones,* 44 Wis. 498, wherein the court held in the syllabus:

"One who purchases land with knowledge of such facts as would put a prudent man upon inquiry, which, if prosecuted with ordinary diligence, would lead to actual notice of rights claimed adversely to his vendor, is guilty of bad faith if he neglects to make such inquiry, and is chargeable with the 'actual notice' he would have received."

See, also, *Hooser v. Hunt,* 65 Wis. 71, 26 N. W. 442, and *Pope v. Nichols,* 61 Kan. 230, 59 Pac. 257.

The statutes of California on this question are very similar to our own. They will be found embraced in section 18 to 19

of the Civil Code. The case of *Prouty v. Devin, et al.,* 118 Cal. 258, 50 Pac. 380, was one somewhat similar to the one at bar, in which the court said:

"Section 1217 of the Civil Code provides that an unrecorded instrument is valid as between the parties thereto and those who have notice thereof. Notice is actual and constructive. Actual notice is that which consists in express information of a fact, and constructive notice is that which is imputed by law. Civ. Code, § 18. 'Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact has constructive notice of the fact itself in all cases in which by prosecuting such inquiry he might have learned such fact' (Civ. Code, § 19), * * * for the general doctrine, as well as the express provision of section 19 of our Civil Code, is that whatever puts a party on inquiry amounts in judgment of law to constructive notice, provided the inquiry becomes a 'duty, and, if followed, would lead to the knowledge of the requisite facts by ordinary diligence and understanding.'"

After reciting the evidence in the case, the court concluded the opinion by saying:

"The question for determination is whether there was actual notice upon the part of Bates of circumstances sufficient to put him as a prudent man upon inquiry. If so, then in law he is chargeable with constructive notice and knowledge of the fact of this pre-existing mortgage."

Mr. Wade in his work on the Law of Notice, dealing with this question (sections 3, 4, and 5), says:

"Actual notice has been defined by declaring that it exists 'when knowledge is actually brought home to the party to be affected by it.' This excludes all notice which does not amount in fact, as well as theory, to actual knowledge. There can be no doubt that this definition is too narrow. * * * 'The courts have accordingly refused to confine actual notice within the narrow limits of the definition quoted above. Their departure from the rule that renders actual notice and actual knowledge synonymous terms, is perhaps most conspicuous in cases arising under the registry laws, where, in order to give precedence to a prior unrecorded instrument over a subsequent one affecting the same land, which has been duly recorded, it is necessary to prove that the subsequent purchaser had actual notice of the prior unregis-

tered instrument. * * * There are two classes of actual notice which for convenience may be designated as (1) express, which includes all knowledge or information coming to the party to be charged of a degree above that which depends upon collateral inference, or which imposes upon him the further duty of inquiry; and (2) implied, which imputes knowledge to the party because he is shown to be conscious of having the means of knowledge, though he does not use them. In others words, where he chooses to remain voluntarily ignorant of the fact, or is grossly negligent in not following up the inquiry which the known facts suggest."

The author in section 8, further discusses the notice which he terms "implied," by stating that it does not include either positive knowledge or information so direct as to necessarily carry conviction to the mind of the person notified, and neither does it belong to that class which depends upon legal presumption, but that it is substantial evidence, from which the jury after estimating its value may infer notice. He then says that it differs from constructive notice with which it is frequently confounded and which it greatly resembles with respect to the character of the inference. upon which it rests; constructive notice being the creature of positive law, or resting upon strictly legal inference, while implied notice arises from inference of fact. The language of our statute it will be observed in this connection is that the party having actual notice of circumstances, etc., is deemed to have constructive notice of the fact itself; so that it seems to us the constructive notice of our statute and the implied notice referred to by Mr. Wade are almost, if not exactly, the same in legal effect.

The issues presented are all controverted questions of fact, and as such should have been submitted to the jury for its determination. The plaintiff bears the burden of establishing the conveyance and title under which she claims, and that the defendant, had either actual or constructive notice thereof. There may be a question of plaintiff's laches involved, and, if insisted on, it also, along with the other questions, should be left to a jury.

The judgment of the lower court is accordingly reversed, and the cause remanded for a new trial.

All the Justices concur.