O. O. OWENS, Plaintiff in Error,

v.

**EL GATO INVESTMENT COMPANY,**
Defendant in Error.

No. 37637.

Supreme Court of Oklahoma.

July 2, 1958.

Rehearing Denied Nov. 25, 1958.

Hudson, Hudson & Wheaton, Tulsa, for plaintiff in error.

McNeill & McNeill, Tulsa, for defendants in error, Glenn J. Smith and Bess L. Smith.

Rosenstein, Fist & Mesirow, Tulsa, for defendants in error, Pauline Parrish, C. E. Watson and Ethel Windsor Watson, as successors to the El Gato Investment Co., a corp.

BLACKBIRD, Justice.

The real estate around which revolves the controversy culminating in this action is a vacant lot situated on the Southwest corner of Eighth Street and Boston Avenue, in Tulsa, Oklahoma, described as the North Seventy-five (75) feet of Lot One (1), Block One-hundred eighty-one (181), of said City, purchased in 1928, by one of the defendants in error, El Gato Investment Company, usually referred to simply as "El Gato." The property which adjoins it on the South and consists of a one-story permanent type of business building on an "inside" site, which includes the South twenty-five feet of the aforesaid Lot One (1), has been owned for many years by C. E. Owens, brother of the plaintiff in error, and will hereinafter be referred to as the "Owens Building." On its north side, the building has three double doors which open out upon the vacant lot.

On October 4, 1930, Southwestern Stores Corporation obtained a lease for a term of years on El Gato's lot at a total rental of $60,000, payable in monthly installments of $500 each. On the same day, it

obtained a five-year lease on the Owens Building, at a rental of $700 per month. Through the oral negotiations conducted with C. E. Watson, for El Gato, by plaintiff in error, who "handled" the Owens' Building for his brother, the two leases were made "interlocking" or "dependent", in that they both referred to each other and provided that if the lessee violated one, the lessors of both might terminate them, and recognized generally a greater value, to both lessors, in the two properties' joint use, than their separate use. The value of having the lot available for rental in connection with rental of the building was particularly recognized in a provision of the lot lease, referred to in the building lease, as granting subrogation to Owens of the Stores Corporation's rights under the lot lease. In fact, Owens was given such rights and powers in the lot lease that, under certain specified conditions, he could take possession of the lot without even an assignment of the lease.

On June 16, 1931, the above-mentioned lot lease was superseded by a new lease Nathan Gens and Herbert Barall, who managed and operated Southwestern Stores Corporation, obtained on the lot as co-partners doing business as Barall Food Stores for a period of 18 months, for which they agreed to pay a total rental of $9,000, in equal monthly installments of $500 each on the first of every month beginning July 1, 1938. The lease also authorized said lessee to erect such structures on the lot as might be desired and to operate a food store therein under the name of "Colonial Stores", but it specifically provided that no permanent improvement should be placed on, or removed from, it without the written consent of the lessor "and O. O. Owens * * *". Under another provision, the lessee could not assign said lease, without the written consent of the lessee "and O. O. Owens * * *". On the same date, O. O. Owens entered into a written, but unrecorded, "Contract for Sale of Real Estate" with El Gato to purchase the vacant lot in question. According to his testimony, said Owens and his brother, C. E., hoped, upon acquisition of this lot, to use it and the adjoining one as the site for a larger building than the one C. E. Owens then owned.

It is in the alleged breach of this contract by O. O. Owens that the controversy here involved had its inception. According to its terms, he was to pay a total price of $49,359 for said lot, and the beginning of his possession was to coincide with the beginning, on July 1, 1938, of Barall Food Store's lease term. According to the contract, Owens (sometimes referred to therein as "the party of the second part") was to pay the aforesaid consideration for the lot, by transmitting to El Gato (sometimes referred to therein as "the party of the first part"), Barall Food Store's $500 monthly rental payments, which were to be applied by El Gato as follows:

"(1) To the taxes, both ad valorem and paving, assessed against said lot, beginning as of July 1, 1938. For the purpose of interest calculation, taxes are to be prorated and charged against rent credit each month.

"(2) To the interest, payable by O. O. Owens upon the purchase money obligation, hereinafter set forth.

"(3) The balance to be credited against the principal of said obligation. Interest on said purchase obligation of Forty-nine Thousand Three Hundred and Fifty Nine Dollars ($49,359.00) is to be payable at the rate of five percent (5%) per annum upon deferred balances."

The lease also provided that the entire purchase price should be paid within eighteen months "from July 1, 1938", and also contained the following provisions, among others:

"In the event the lessor, Barall Food Stores, does not make the monthly payments provided herein in the lease above mentioned, it shall be the obligation of O. O. Owens to make sufficient payments within five days after notice of default from El Gato Investment Company to second party.

&ast; &ast; &ast; &ast; &ast; &ast;

"*In the event of any failure on the part of the party of the second part to faithfully keep and perform* each and all of the above conditions, covenants and agreements, or to make any of the payments at the time or in the manner above specified, *this Contract shall be void at the option of the party of the first part, and the first party shall be entitled to immediate possession of said premises.*

"In addition to the rights and remedies contained in the foregoing paragraph, because of the fact that this contract is of great value to the second party in connection with the lease of the lot and building immediately to the South of the Real Estate herein described, and because damages under this contract are not readily capable of ascertainment and are too difficult for a court to determine, and because the effect of this contract is to limit the sale of the real estate exclusively to O. O. Owens for a period of eighteen (18) months, in the event of any default of any of the conditions, covenants and agreements, or in the event of the failure to make any payments at the time and in the manner above specified by the second party, the first party in addition to retaining all payments theretofore made by Barall Food Stores, or by the second party, shall have the right to receive and recover from second party the further sum of Ten Thousand Dollars ($10,000.00) as agreed liquidated damages. * * *" (Emphasis ours)

Owens' claimed breach of the above-quoted contract occurred as hereafter related. At the end of December, 1939, when Barall Food Store's eighteen-months lease expired and its occupancy of the lot ended, none of the $49,350 Owens had, by the above-quoted contract, agreed to pay El Gato for it, had been paid, except an amount between three and four thousand dollars that had been credited on said price out of the $9,000 in rentals received from said food store tenant (as provided in the

above-quoted "Contract for Sale * * *"). Owens then entered into negotiations, through his now deceased attorney, with El Gato, represented by Mr. Watson, to extend the life of the "Contract for Sale * * *" beyond the eighteen months prescribed therein for his payment of the full purchase price. After several months in the early part of the year 1940, during which the matter was discussed intermittently, an oral agreement was reached under which the above "Contract for Sale * * *" was extended, in consideration of Owens' payment to El Gato of the sum of $200 per month. Owens thereafter made sixteen of such monthly payments, all by check, beginning with one dated May 11, 1940, and ending with one dated August 18, 1941. No payment was made in September, 1941, or thereafter, and El Gato served upon Owens an instrument dated October 27, 1941, entitled: "Notice of Termination of Contract, Demand for Possession and for Payment of Damages", which, omitting its formal parts, is in words and figures as follows:

"You will take notice that one certain contract under date of June 16, 1938, between El Gato Investment Company, a corporation, as party of the first part, and O. O. Owens, as party of the second part, for the sale by said party of the first part and purchase by said party of the second part of the following described real estate situated in Tulsa County, Oklahoma, to-wit:

"The North Seventy-five (N 75) Feet of Lot One (1), Block One Hundred Eighty-one (181), in the Original Town, now City, of Tulsa, Oklahoma, is hereby terminated on account of and for the reason that you have made default in the performance of the terms and conditions of said contract and in the payment of the purchase price of said property as provided in said contract.

"Demand is hereby made for immediate possession of said real estate, and for the payment by you to the under-

signed, El Gato Investment Company, of the sum of Ten Thousand ($10,000.-00) Dollars, as agreed liquidated damages, in accordance with the terms and provisions of said contract."

Two days later, or on October 29, 1941, El Gato, as plaintiff, commenced the present action as the trial court's Cause No. 70327, seeking recovery against Owens, as defendant, of the sum of $10,000 in liquidated damages on account of said defendant's alleged breach of the hereinbefore quoted written contract by defaulting in the payment of the lot's purchase price therein named.

Thereafter, on September 18, 1942, during the preliminary stages of this cause, and before it was at issue, plaintiff purported to convey, by one deed, a one-half interest in the lot to Mrs. Pauline Parrish, who was president of the plaintiff corporation, and the other one-half to Mr. Watson and his wife, Ethel Windsor Watson, who, with Mrs. Parrish, were the directors of said corporation. The next day, the plaintiff corporation was dissolved by court order, and its petition in the present action was amended to show that Mrs. Parrish and Mr. and Mrs. Watson were authorized to continue said action in plaintiff's name, as trustees of said dissolved corporation's creditors and stockholders.

More than three years later, and still during the pendency of the present action, the lot involved was sold to Mr. and Mrs. Glenn J. Smith for the sum of $35,625, the purported conveyances to them being by deeds executed in January, 1946, by Mrs. Parrish and the Watsons.

Due to delays occasioned by disposing of preliminary pleadings in the case, etc., it was not until March 24, 1948, that the defendant Owens pleaded to the merits of plaintiff's amended petition. On that day, he first moved the court to make Mrs. Parrish, the Watsons and the Smiths additional parties defendant, and, on the same day, filed his answer and cross petition. In said pleading, Owens, among other things, denied, in general substance, that he had breached any contract with plaintiff;

and alleged that, under the specific terms of the afore-mentioned oral contract he was to pay plaintiff $2,400 per year, which was the equivalent of 5% interest on the unpaid remainder of the lot's purchase price, and that for, and in consideration of, payments to them at that annual rate, plaintiff promised to extend the time, specified in the written contract for his payment of the purchase price remainder, until termination of certain other litigation in which Owens was then engaged. Owens further alleged that said other litigation did not end until January 13, 1942, and that, up to that date, under the aforesaid oral extension agreement, he owed plaintiff the additional sum of $2,666 in interest payments, and was entitled, upon completion of such payments (which inferentially he would have accomplished had plaintiff not breached the contract and refused to accept further payment) to the option of paying the remainder of the lot's purchase price and having plaintiff convey the lot to him or of designating someone else to pay said remainder and take title to the lot. In said pleading, Owens offered to pay both the aforesaid interest balance and purchase price remainder and any other sum found by the court to be due plaintiff from him under the written contract and subsequent oral one modifying it. By way of more specifically showing that his failure to carry out his part of the contract arrangements was due to plaintiff's fault, Owens alleged plaintiff had breached the oral contract by serving upon him the hereinbefore quoted "pretended notice of termination" of the written contract. Owens further alleged, among other things, in substance, that plaintiff's acceptance of his performance under the oral contract modifying the written one, precluded it from proceeding under the written one, as originally executed, and from urging that the "oral contract comes within * * * the statute of frauds. * * *".

In his cross petition, Owens referred, among other things, to the hereinbefore described purported conveyances of the lot from plaintiff to Mrs. Parrish and the Wat-

sons, and from the latter to the Smiths, all occurring after commencement of the action, and charged, in substance, that said deeds were executed and delivered in furtherance of a conspiracy to defraud him of the property and abolish his rights under the contract with plaintiff. Owens further charged, in substance, that, instead of being bona fide purchasers of the lot for value, the Smiths gave no true consideration for it and held only its naked record title in trust for the cross-petitioner or Mrs. Parrish and the Watsons. For relief, Owens prayed the court for a judgment cancelling the deeds which had placed the purported record title to the lots in the Smiths, and requiring the plaintiff corporation, or its trustees, to accept the sums of money he was tendering in compliance with the aforesaid contract arrangement, and to thereupon execute a warranty deed conveying the lot to him. He further prayed, "for his costs and * * * such further relief to which he may in equity be entitled."

In their answer and cross petition, the Smiths denied, in substance, among other things, that they had participated in any fraud or conspired to cheat or defraud the defendant Owens or prevent him from obtaining title to the lot, and, in connection with its purchase by them, alleged certain facts calculated to show that they were its bona fide purchasers for value without notice of any of the facts upon the basis of which Owens was then asserting his claim to it. They further cited the fact that their deed was recorded on January 22, 1946, more than two years before Owens filed any pleading in the cause asserting any claim of title or ownership to the lot, and asserted, in bar of such claims, the two-year period of limitations prescribed by Tit. 12, O.S.1951 sec. 95, "Third" paragraph, for recovery on the ground of fraud.

At the trial without a jury, Watson, for plaintiff, and the defendant Owens, for himself, both testified in substance that said parties had an oral agreement modifying the written "Conract for Sale * * *", but their testimony was in conflict as to its specific terms. According to Watson, the agreement was that Owens' time within which to complete payment of the lot's purchase price was to be extended merely by the month, as, if and when he transmitted each two-hundred-dollar monthly payment to plaintiff, and, any month that he defaulted, said agreement, ipso facto, terminated, and plaintiff was then entitled to exercise its right to terminate the written contract, according to its provisions. Owens' version of the oral agreement seems to be that his extension of time thereunder was to last until certain tax litigation (that his answer and cross petition referred to) was terminated, whenever that occurred.

Another point upon which these witnesses' testimony was in conflict concerned which of the parties breached the contract, Watson testifying that in September, 1941, Owens refused to continue his $200 payments, while Owens testified that plaintiff, through Watson, refused to accept any more of such payments.

There was also testimony, from which it could be reasonably concluded, that, sometime before the Smiths purchased the lot, plaintiff or the trustees, had gone into possession of it, placed a "For Sale" sign on it, and, over a considerable period of time, had openly attempted to sell it as owner. It was also indicated that for some time, since their purchase of the lot, the Smiths had been renting it to some undisclosed tenant as a parking lot.

The trial ended in January, 1954, and, after taking it under advisement for over two years, the trial court, in June, 1956, entered its judgment granting Mrs. Parrish and the Watsons recovery of $10,000 "as liquidated damages" against the first defendant and cross petitioner, Owens; terminating the El Gato-Owens "Contract for sale * * *" on the ground of Owens' breach of it; and quieting title to the lot in the Smiths, after holding that Owens' plea for cancellation of their deed and those from El Gato to Mrs. Parrish and the Watsons on the ground of fraud, was barred by the statute of limitations. After

the overruling of Owens' motion for a new trial, he perfected the present appeal.

For reversal, Owens argues various assignments of error under five principal propositions. We consider it unnecessary, however, to lengthen this opinion by discussing them in detail, or the arguments advanced in opposition thereto, as we have concluded that the trial court's judgment cannot stand because of two fundamental considerations.

▇ The first of these is that El Gato commenced this action prematurely. If and when Owens, shortly before El Gato served upon him the hereinbefore described Notice of October 27, 1941, refused (as testified to by Watson and denied by Owens) to make further $200 monthly payments, under the oral modification of the parties' written contract, then El Gato should have given him notice of its election to exercise its option to terminate the contract unless he discharged his obligation thereunder *within a reasonable time*, and have tendered him a deed to the lot at the designated time, conditioned upon his doing so. As said in Whale v. Pearson, 201 Okl. 619, 208 P.2d 552, 556:

> "If by the terms of the contract it is optional with the vendor to rescind or forfeit the contract on default, the notice should be to the effect that the contract will be rescinded or forfeited unless the purchasers perform covenants of the contract within a reasonable time therein specified."

In Moore v. Kelly, 57 Okl. 348, 157 P. 81, 82, this court held, among other things:

> "A. entered into a contract with B. wherein A. agreed, for a certain consideration to be paid at that time, to deed B. certain property. It was agreed that time was the essence of the contract and that the contract should be void at the option of A. if B. failed to pay the amount due on that date. B. went into possession of the property and defaulted in payment. A. took no steps to rescind the contract until about two years afterwards.

> "Held: (a) * * *

> "(b) Before A. could rescind after such waiver, he must give B. timely notice of his intention to rescind and fix a certain and reasonable time within which he would be required to perform his part of the contract. (c) After such a notice B. could avoid the rescission by complying, before the date fixed, with the terms of the contract.

> "After the vendor has waived his option to rescind before he can put the vendee in default, he must tender a deed as a condition to demanding payment, and he cannot, without such tender, declare a forfeiture."

See also Graves v. Chambers, 110 Okl. 1, 236 P. 25; Taylor v. Goelet, 208 N.Y. 253, 101 N.E. 867, Ann.Cas.1914D, 284; Bowman v. Schatzinger, 14 Ohio Cir.Ct.R., N.S., 513; Lamont v. Ball, 93 Cal.App.2d 291, 209 P.2d 9, 11; Am.Jur., Vol. 12, "Contracts", sec. 441, Vol. 55, "Vendor and Purchaser", secs. 581, 625, 630 and 632; 17 C.J.S. Contracts §§ 435 and 447. It is plain from the above that the notice El Gato served upon Owens was not such a one as required under the circumstances, and, from a careful examination of the record we do not think the evidence concerning Owens' conduct was sufficient to show that he waived such notice. In this connection, notice Asher v. Hull, 207 Okl. 478, 250 P.2d 866, and Freedman v. Rector, etc., of St. Mathias Parish, 37 Cal.2d 16, 230 P.2d 629, 631, 31 A.L.R.2d 1. As El Gato did not proceed properly in its attempt to terminate the contract and give Owens a reasonable time to pay the balance he owed it thereunder, before filing this action, Owens' tender of performance, after the filing of the action, should have been accepted; and the trial court erred in purporting, by its judgment, to terminate their contract.

▇ We see, in the arguments presented herein, no legal, or equitable, impediment to requiring that such tender be accepted. Under the evidence in this case, the Smiths cannot be held to have purchased the lot

without notice of Owens' claims thereto. We think that under the law and the evidence they had both actual and constructive notice thereof. Under the doctrine of lis pendens asserted in this action by Owens, they purchased said property at the risk of losing it by a final adjudication of his claims. The Smiths argue, both specifically and by inference, that in 1946, when they purchased the lot (more than two years before Owens filed his answer and cross petition, asking, among other things, for specific performance of his contract for its purchase from El Gato) there was nothing on file in the present action to show that it involved any claim of title to the lot adverse to their grantors, but, instead, on the basis of El Gato's petition then on file, the action was merely one for the recovery of money, citing Flanagan v. Clark, 156 Okl. 230, 11 P.2d 176. We do not agree. El Gato's pleadings from the very beginning of the action in 1941, plainly showed, by containing the legal description of the property, by exhibiting a copy of the "Contract for Sale of Real Estate", and by allegations of fact, that the contoversy was such that title to the lot, and possible claims by Owens of equitable rights therein, were potentially involved. We do not think the fact that Owens had not, as of that time, filed any pleading revealing exactly what his claims might be, with reference to the lot's ownership, precludes application of the doctrine of lis pendens to the Smiths, though there may be ground for argument to the contrary. In this connection notice 34 Am.Jur., "Lis Pendens", sec. 30.

Furthermore, Smith, on redirect examination, admitted thinking, at the time of his and his wife's purchase, that this action was one to rescind the contract. This purchaser might well have anticipated, from information he already had, and independent of its being set forth in pleadings, that, when Owens did plead to the merits, he would claim equitable rights in the title to the lot. Smith virtually, or in substance, admitted the truth of Watson's testimony to the effect that before he (Smith) ever talked to Watson about purchasing the lot, he and Watson had been close friends socially for many years, to the extent of visiting in each others' homes. Smith never specifically denied Watson's statement (in answer to a cross examination question by one of Smith's attorneys) that "over our years I told him (Smith) the situation of our trouble with O. O. Owens." If this undenied statement is true, and means all that it implies, it may reasonably be assumed that Smith was also advised of the control that Owens had, for years, exercised over the lot, and of the facts concerning its relationship to the Owens' building, (hereinbefore shown) that would make him reluctant to relinquish that control without succeeding to the lot's ownership. An excerpt from Watson's cross examination is as follows:

"Q. * * * Did you, prior to the time you and Mr. Smith closed this deal, advise Mr. Smith, in substance and effect, of the pendency of this action and the fact that Mr. Owens had executed a contract in writing looking towards the purchase of the property? A. Yes. I did not give him the details about this.

* * * * * *

"Q. Well, tell me the substance of it, please, sir. A. You say what I told him and I will admit it.

"Q. No, I might be inaccurate. A. I just said we had a law suit on with O. O., this is just generally speaking; I told him we had a law suit with O. O. Owens, that he had agreed to buy the property, when the time came to settle up, he would not take it, and further stated that at the time we bought it, we knew that. He said to me, 'What about this Owens deal?' I said, 'Oh, hell there is nothing to that,' or words to that effect. * * *"

On direct examination, Smith was allowed to answer, in the negative, the following question:

"Q. Did you ever have any notice of the claim of O. O. Owens prior to the time he filed his cross-petition here, which is March 24, 1948 * * * ?"

Immediately following this, Smith's direct examination was as follows:

"Q. * * * Did anyone ever tell you about Mr. Owens' claim or asserted * * * oral contract, changing or modifying the original contract? * * * A. No, I can tell you what Mr. Watson told me."

"Q. * * * Well, what did Mr. Watson tell you? A. * * * He told me that there was a law suit with Mr. Owens and the El Gato people about some back rent, but it had nothing to do with the title to the lot."

That Smith did not, in ascertaining the merchantability of his prospective vendors' title, before purchasing the lot, rely completely upon the opinion he testified Watson had given him as to the character of the action at that time, is shown by his own testimony as to what he told the lawyer he employed to examine the title. When asked, on cross examination, if he had told the lawyer that Watson had informed him there was a law suit pending in connection with the property, Smith answered: "No, I told him to go and examine and see if there was any law suits against it that would involve or had anything to do with the title to the lot." From the foregoing, it might be concluded that, instead of ascertaining through Owens, personally or by agent or attorney, exactly what Owens' claims were with reference to the "Contract for Sale of Real Estate" (which, as El Gato's pleadings then showed, was the foundation of this action) Smith sought to shield himself behind his counsel's report or opinion as to what the public records revealed. We think the Smiths' position analogous to that of J. R. Catalina in Luker v. Moffett, 327 Mo. 929, 38 S.W.2d 1037, 1041, and Mr. Snyder in McBride v. McBride, 250 Mich. 601, 230 N.W. 933, 934, wherein it was held to be their duty to make an investigation to learn the true facts. In the latter case, the court said of Snyder:

"Notwithstanding Mr. Snyder * * * possessed * * * the knowledge above indicated, which was abundantly sufficient to put him on his guard, he made no inquiry from available parties in an effort to ascertain the truth. We are satisfied that Mr. Snyder sought to blind himself as to the real situation, thinking he could profit by relying on information found in the public records. He did not act in good faith, and should not be allowed to shield himself on the theory or claim that he is an innocent holder of the title * * *".

In Daniel v. Tolon, 53 Okl. 666, 157 P. 756, 761, 4 A.L.R. 704, after citing our statutes on Notice, this court said:

"It is a general rule, independent of statute, that where such facts or circumstances are known to a person in relation to a matter in which he is interested, as are sufficient to make it his duty as an honest and prudent man to inquire concerning the rights of other persons in the same matter, and the course of inquiry thus suggested would, if followed with due diligence, lead to a discovery of rights in conflict with his own, that he will be held chargeable with notice of all that he might thus have discovered, and will not be heard to say that he did not actually know of the fact or claim in question. In such cases means of knowledge, with a duty of using them, are deemed equivalent to knowledge itself, and passive good faith will not serve to excuse willful ignorance. 21 Am. & Eng.Enc.Law, 584. The methods by which notice of prior equities or unrecorded conveyances may be given, so as to affect subsequent purchasers, are as various as the means by which knowledge or information of any fact may be communicated, or by which persons may be led to believe in the existence of such facts."

In the cited case, we further said:

"In Cooper v. Flesner, 24 Okl. 47, 103 P. 1016, 23 L.R.A., N.S., 1180, 20 Ann.Cas. 29, it was said that: 'The

words "actual notice" do not always mean in law what in metaphysical strictness they import. They more often mean knowledge of facts and circumstances sufficiently pertinent in character to enable reasonably cautious and prudent persons to investigate and ascertain as to the .ultimate facts.'

"And further that: 'One who purchases land with knowledge of such facts as would put a prudent man upon inquiry, which, if prosecuted with ordinary diligence, would lead to actual notice of rights claimed adversely to his vendor, is guilty of bad faith if he neglects to make such inquiry, and is chargeable with the "actual notice" he would have received.'"

In view of what Smith (and presumptively his wife also) knew, and of the public record showing, in regard to the affairs of El Gato, and the relationship of Mrs. Parrish and the Watsons thereto, the fact that the Smiths purchased the lot from the latter individuals, rather than from El Gato, furnishes them no protection, and they cannot, under the circumstances, be held to have been innocent purchasers. Although Smith, as a witness, and contrary to Owens' testimony about a conversation he had with Smith on a Tulsa street corner, denied that he had ever been apprised of Owens' claims in regard to the lot, it is obvious, on the basis of his own testimony, that he had sufficient information, which, as a prudent man, should have put him upon inquiry as to such claims. Accepting as true, Smith's denial that Owens ever talked to him about it, the record indicates that if Smith had inquired of him, Owens would readily have disclosed what he later asserted by pleadings in this action. This, and that Owens had not abandoned his claims, was indicated by Smith's relating what occurred thereafter in 1950, when he was about to sell the lot to one Jack Hamil. Smith testified that Hamil decided Smith's title to the land was not merchantable, and, in explanation, testified: "I think that Mr. Owens told him (Hamil) if he bought it,

it would be subject to damages to his (Owens) property."

In view of what we have already said, there can be no valid foundation for application of the period of limitation herein asserted by the Smiths as barring the relief sought by Owens. See Probst v. Bearman, 76 Okl. 71, 183 P. 886; 54 C.J.S. Lis Pendens § 54. If, as we have determined, the Smiths took their deed subject to this action, and the adjudication of Owens' rights to the lot herein, they could not defeat application of the doctrine of lis pendens by having their deeds on record any period during the pendency of the action.

In accord with the foregoing views, we hold that the trial court's judgment was against the weight of the evidence and contrary to the law properly applicable thereto. Said court should have held that the contract between El Gato and Owens for sale of the lot was never lawfully terminated; further, that when, in the action, Owens tendered performance thereunder, said contract was still in force and effect; and, instead of purporting to cancel it, should have required acceptance of said tender. Because of error in said judgment, Owens' motion for a new trial should have been sustained. However, in view of our prerogative, in actions like the present one, of rendering, or causing to be rendered, the judgment that the trial court should have rendered, we will condition our ordering of the granting of a new trial upon entry of the judgment said court should have entered in the first instance, on the basis of the positions the parties took in the action and of the equitable considerations applicable thereto.

Accordingly, the judgment appealed from is reversed and the trial court is directed to vacate it and its order overruling Owens' motion for a new trial, and enter, in lieu thereof, an order sustaining said motion, or, in the alternative, a judgment such as we have determined it should have entered, under which the amounts Owens tendered during the action, and under his

**32**

written contract with El Gato and the oral amendment thereof, will be accepted, and $35,625.00 thereof paid to the Smiths in reimbursement for the price they paid for the lot; the remainder of said tendered sums to be paid to the proper party, or parties, for the benefit of the former corporation, El Gato Investment Company, or its lawful successors; record title to the lot thereupon being placed in Owens, and his title quieted against all adverse claims of other parties to the action.

CORN, V. C. J., and DAVISON, JOHNSON, WILLIAMS and JACKSON, JJ., concur.