The KROGER COMPANY, Appellant,

v.

J. WEINGARTEN, INC., Appellee.

No. 14322.

Court of Civil Appeals of Texas.

Houston.

April 9, 1964.

Rehearing Denied June 4, 1964.

Second Rehearing Denied June 25, 1964.

John F. Heard, Houston, and Baker, Botts, Shepherd & Coates, Houston, of counsel, for appellant.

James W. Dilworth and Selby W. Sullivan, Houston, and Andrews, Kurth, Campbell & Jones, Houston, of counsel, for appellee.

WERLEIN, Justice.

This suit was brought by appellee, J. Weingarten, Inc., the lessee and operator of a super-market in Oak Forest Addition to the City of Houston, herein referred to as Weingarten, against appellant, The Kroger Company, referred to as Kroger, to enjoin Kroger from constructing and operating a competing super-market on a tract of land within Oak Forest Addition about one mile from Weingarten's store, in violation of certain restrictive covenants. The trial court, without a jury, rendered judgment enjoining Kroger for the duration of the

Weingarten lease from constructing and operating a super-market on the tract in question. Appellant has appealed from such judgment, contending that the restrictions made the sole basis of the court's injunction, violated the anti-trust laws of Texas.

A brief summary of the evidence will be of assistance in determining whether or not the court erred in prohibiting the construction and operation of a competing super-market within two miles of Weingarten's store in violation of the restrictions. In 1946, Frank ·W. Sharp, herein referred to as Sharp, a real estate developer, with Mr. Douglas McGregor and Mr. Ben Taub, planned a residential subdivision with adequate community center facilities, the subdivision being known as "Oak Forest Addition." In connection with such development plans, Oak Forest Corporation was formed. In 1950 Sharp withdrew from the corporation, and took in lieu of his 40% stock interest therein 40% of the unimproved land then owned by said corporation. With the land thus acquired, Sharp continued his activities in the Oak Forest area. Part of the undeveloped land acquired by Sharp in lieu of his stock in said corporation was later developed into the Oak Forest Shopping Center, in which Sharp had a divided 40% interest. He then created Oak Forest Realty Corporation, referred to as Realty Corporation, which he solely owned. 20% of the proposed shopping center tract was in the name of the newly formed Realty Corporation and the remaining 20%, the southeast corner, was in Sharp's name individually. Sharp commenced development of a part of the shopping center land acquired by his Realty Corporation, and built a super-market and leased the same to Minimax Food Chain. He also developed the remainder of the Realty Corporation tract.

In the summer of 1954 Taub and McGregor approached Sharp with a proposal that he buy the remaining 60% of the Oak Forest Corporation and its lands. In order to do so, it was necessary for Sharp to put together enough sales and leases to finance the purchase. In such connection he approached Weingarten and negotiations were begun in the latter part of 1954, and a tentative agreement between Sharp and appellee was outlined on December 6, 1954 in a letter of intent between Weingarten and Sharp's wholly owned Realty Corporation.

Weingarten decided that the proposed location for its super-market would be suitable only if the number of food stores in the area could, in some way, be limited. It felt that it was necessary for its protection to have restrictions covering a circular area having a two mile radius extending from the leased premises. According to the testimony of Mr. Bernard Weingarten, the subject of restrictions was discussed from the very beginning. In said original letter of intent it was provided that " * * * the Lessor will agree not to lease space to other food markets, other than one already existing, within a radius of two miles of the subject property." At the trial it was estimated that the two mile circle covers approximately 13 square miles and contains approximately 40,000 people.

Before any lease was executed Sharp became concerned about his health, and wanted to make arrangements that would protect his two daughters, Elizabeth Lucille Sharp, now Mrs. Hooten, and Mrs. Frances Sharp Haden, if anything happened to him. As a result of a meeting with his attorney, two irrevocable trusts, one for each daughter and each in the sum of $1,000.00 with Bank of The Southwest, herein referred to as Bank, as trustee, and Oak Forest Center Corporation, herein referred to as Center Corporation, were created by Sharp. The trusts were executed on February 28, 1955, and the charter for Oak Forest Center Corporation was issued March 1, 1955. The capital of Center Corporation was only $2,-000.00, and all of its stock was held by the Bank as trustee for said two trusts. The cost of the property which Oak Forest Corporation by its stockholders and directors, McGregor and Taub, agreed to sell and did sell to Center Corporation, was $1,000,080.-00. Center Corporation, as part of the pur-

chase price, executed its note in the sum of $794,000.00, secured by a deed of trust on the property purchased. In order to effectuate the transaction, it was necessary for Sharp to guarantee payment of the note. Additionally, Sharp negotiated a note on behalf of Center Corporation from the trustee Bank in the amount of $110,000.00, and loaned the corporation approximately $40,000.00. Mrs. Sharp loaned the corporation an additional $18,000.00.

After Oak Forest Corporation conveyed all of its property to Center Corporation by deed dated March 5, 1955, Center Corporation on August 19, 1955 leased to Weingarten for a period of 25 years, with an option for two 10-year extensions, the property in Block 26, Oak Forest Addition, Section III, located at 43rd Street and Oak Forest Drive, being the property in the community center where Weingarten operates its super-market. This base lease, containing some 25 pages, which was executed only by Center Corporation and Weingarten, was never filed for record, but a memorandum thereof or short form lease, also dated August 19, 1955, which was executed by said lessor and lessee, was duly filed for record on September 14, 1955. A separate restrictive agreement of the same date, which was executed not only by Center Corporation but also by Sharp and Realty Corporation, was also filed for record on September 14, 1955.

Appellant contends that the trial court erred in granting the injunction because the combined agreement of Center Corporation, Weingarten, Sharp and Realty Corporation creating the restrictions and prohibiting the construction of a competing super-market within two miles of Weingarten's store is void and unenforceable. Appellant also complains of the court's findings in its judgment to the effect that Sharp had a property interest in Center Corporation and the Kroger tract and that Center Corporation and Realty Corporation were alter-egos of Sharp incapable of conspiracy under the anti-trust laws of Texas, because there is no evidence supporting such findings. Appellant further asserts that there is insufficient evidence to support the finding that Sharp and Realty Corporation executed the restrictions agreement to protect a property interest of Sharp in Center Corporation; and that the restrictive covenants in question are as a matter of law unreasonable as to time and area.

Appellee takes the position that the restrictions contained in the base lease are valid and enforceable and not in violation of the anti-trust laws of Texas since such lease and also the recorded memorandum thereof were executed only by Center Corporation and Weingarten, and applied only to the land owned by Center Corporation. It cites the case of Schnitzer v. Southwest Shoe Corporation, Tex.Sup.1963, 364 S.W. 2d 373, for the proposition that a lessor may validly agree to restrict other property owned by it in order to induce a lessee to enter into a lease. On August 19, 1955, when the lease was executed, and on September 14, 1955, when the memorandum of lease and restrictive agreement were filed for record, Center Corporation owned not only the Weingarten tract but also other property in Oak Forest Addition within the two mile limit, including the unimproved property which was later acquired by Gromarco, Inc., a wholly owned subsidiary of Kroger, and which was conveyed by Gromarco to Kroger. The tracts conveyed by Gromarco to Kroger are contiguous and slightly less than one mile from the center of the land leased to Weingarten. It is upon such tracts that Kroger proposes and intends to erect and operate a super-market containing more than 4,000 square feet.

Assuming that the area and time specified in the lease are not unreasonable, the restrictions set forth in the base lease might be upheld as not in violation of the anti-trust laws of Texas, if there were no more involved than such lease and the property belonging at that time to Center Corporation, the lessor. At the time the lease was executed, both Sharp and Realty Corporation owned other real estate within the two mile circle but neither of them owned any

interest in the property leased to Weingarten or in the tracts acquired by Kroger.

In the base lease Center Corporation and Weingarten agree that a circle having a radius of two miles from the Weingarten premises is a reasonable area, and that Center Corporation will not engage in the operation of a food store during the term of the lease within such area, and will also restrict the use of all property then owned by it or which it might acquire within such area during the term of the lease, such restrictions to constitute a covenant running with the land. There are certain specialty shops, not pertinent hereto, which are excepted from the operation of the restrictions in the lease. The memorandum of the lease, which was recorded, contains the following provision:

"In said lease the Landlord agrees to certain restrictions on property owned by the Landlord within a reasonable area of the demised premises with such area agreed to be a circle with a radius two miles from the center of the property covered by said lease, and said restrictions on said property being the same as the restrictions set out in a separate agreement between Oak Forest Center Corporation and others with J. Weingarten, Inc., of even date herewith to which restriction agreement and its record reference is hereby made for said restrictions as well as reference to said lease for said restrictions."

It will be noted that the memorandum lease states that the restrictions on said property owned by Center Corporation are the same as the restrictions set out in a separate agreement between Center Corporation and *others* with Weingarten, of even date therewith "to which restriction agreement and its record reference is hereby made for said restrictions as well as reference to said lease for said restrictions." The agreement referred to in said memorandum which contains the restrictions was as stated hereinabove executed not only by Center Corporation, but also by Sharp and Realty Corporation. Such restrictions agreement covers within the two mile circle not only property owned by Center Corporation, the lessor, but also property within such area owned by Sharp individually and by Realty Corporation. Said parties executing such agreement undertook to restrict all the property which they or either of them:

"now own or which they, or either of them may acquire hereafter and during the entire duration of the lease above referred to, within a circle having a radius of two miles of the center of the tract of land covered by the lease from Oak Forest Center Corporation to J. Weingarten, Inc. * * * so that the same shall not during such time be used for the operation of a food store as defined herein, except the property which is leased to J. Weingarten, Inc. by the lease above referred to and except the present leases and buildings now being occupied and used for food stores or grocery stores or stores which sell groceries of one type or another and belonging to the parties hereto and located within the area above described."

The restrictions agreement also provides that the restrictions shall constitute covenants running with the land which may be enforced by Weingarten, its successors or assigns, by injunction, and that they shall apply "to any and all property within such area now owned or acquired during the time these restrictions are in effect by the parties hereto, or now owned or acquired in such time by any corporation of which Frank Sharp, or immediate members of his family, now control or hereafter control."

The evidence shows that Weingarten insisted upon the restrictions agreement being executed before it would accept and execute the lease. Such agreement expressly refers to the lease in question, and provides: "* * * *and as a part of such lease agreement,* it was understood and

agreed that the property hereinafter described would be restricted by the parties hereto for the benefit of J. Weingarten, Inc. * * *" (emphasis supplied). As stated, the parties "hereto" were not only Center Corporation but also Sharp and Realty Corporation, and the property described was all the property belonging to each and all of said parties or which they or any of them might later acquire.

■ The three instruments consisting of the lease, memorandum of lease and restrictions agreement were all executed contemporaneously and pursuant to the agreement of all the parties. They are inseparably linked together and must be construed as a combined agreement or arrangement imposing restrictions upon property whether owned or later acquired by Center Corporation or by either of the other signatories to the agreement, Sharp and Realty Corporation, who had no vendible interest in the leasehold or the Kroger property. When so construed the purpose and effect of the instruments and the agreement entered into is to restrict the establishment and free pursuit of any competing supermarket within the prescribed area on any tract of land owned or later acquired by any of the parties, and thereby prevent competition in violation of Article 7426, Vernon's Annotated Texas Statutes, which as applicable here defines a trust as a "combination of capital, skill or acts by two or more persons, firms, corporations or associations of persons, or either two or more of them for any or all of the following purposes:

"1. * * * to create or carry out restrictions in the free pursuit of any business authorized or permitted by laws of this State.

"2. * * *.

"3. To prevent or lessen competition in the * * * sale or purchase of merchandise, produce or commodities * * *."

■ A trust falling within the prohibitions of Article 7426 is declared to be illegal under Article 7429, V.A.T.S., and under Article 7437, VA.T.S., any agreement involving such a conspiracy is "absolutely void and not enforceable either in law or equity."

In Schnitzer v. Southwest Shoe Corporation, supra, our Supreme Court held that the rigidity of our anti-trust statutes has been softened in certain exceptional situations, such as where the owner or lessor or one in control of premises agrees with another person that the other person shall have an exclusive right or privilege in or on such premises, or that the other person will sell on premises only the products or merchandise of the owner or lessor. Such contracts are upheld when they are collateral or incidental to a lawful lease or grant of premises in which the lessor or grantor has a property interest. The Court further held:

"If the agreement before us related only to the premises owned and leased by Schnitzer the exclusive right given Southwest would be valid as collateral and incidental to the lease of Schnitzer's premises. But if two landowners may validly enter into this type of agreement with a lessee of premises of one only, so could a dozen or all in a given area. We are unwilling thus to extend this exception to the anti-trust laws."

■ There can be no doubt that if the restrictions agreement was incorporated into the lease and made a part thereof, the lease would be in violation of the anti-trust statutes of this State. In the instant case it would appear that an effort was made to get around the anti-trust statutes by not having the owners of other property join in the execution of the lease but by having them agree to impose such restrictions on their property by execution of another instrument to which all were parties. The provision in the contemporaneous restrictions agreement, to the effect that it was understood and agreed by all of the parties that *as a part of the lease agreement* all of

the property owned or later acquired by any of them would be restricted for the benefit of Weingarten, incorporated into the lease agreement an extension of the restrictions to property not owned by Center Corporation, thereby creating restrictions in violation of the anti-trust statutes of Texas.

■ Appellee argues that even if the three instruments when construed together be held void and unenforceable, the court can disregard the restrictions agreement entirely and enforce the restrictions in the lease, since the restrictions in the lease and in the recorded memorandum thereof, apply only to property owned by Center Corporation and the Kroger property which was owned by Center Corporation at the time the lease was executed. Appellee in support of such argument relies upon such cases as Weatherford Oil Tool Company v. Campbell, 1960, 161 Tex. 310, 340 S.W.2d 950; Lewis v. Krueger, Hutchinson & Overton Clinic, 153 Tex. 363, 269 S.W.2d 798; and Spinks v. Riebold, Tex.Civ.App., 310 S.W.2d 668, writ ref. These cases involve contracts of employment containing negative covenants or agreements on the part of the employee not to compete with his employer after termination of the employment. Such a contract is in restraint of trade and will not be enforced in accordance with its terms unless reasonably limited as to time and area. The law is well established in this State that although the territory or period stipulated by the parties may be unreasonable, a court of equity will nevertheless enforce the contract by granting an injunction restraining the defendant from competing for a time and within an area that are found to be reasonable under the circumstances.

■ It is our view that the cases relied upon by appellee are distinguishable from the instant case. As stated by the court in Spinks v. Riebold, supra, contracts of employment containing restrictive covenants will not be declared void because said covenants are unreasonable as to time, or as to the extent of territory covered, or unrea-

sonable as to both time and territory. Such contract is merely void or unenforceable with respect to that portion of the time or area beyond what the court considers reasonable. In said case the court said: "The question before us, it seems, is not whether or not the contract is valid, but as to what extent the court will aid the appellant in the enforcement thereof."

In the instant case the restrictions agreement executed by not only Center Corporation but also by Sharp and Realty Corporation is made a part of the lease agreement and is inseverably woven into its woof and fabric by the agreement of all said parties. The question before us is not to what extent the court will aid appellee in enforcing the combined agreement, but whether such agreement has any validity whatever. Article 7437, V.A.T.S., in plain language states that any agreement in violation of the anti-trust laws "shall be absolutely void and not enforceable either in law or equity." The parties who executed the restrictions agreement, none of whom is a party to this suit, have bound themselves by their contract. This Court has neither the power nor the authority to rewrite their contract for them or for the parties to this suit, by striking therefrom the restrictions agreement which they expressly made a part of the lease agreement, and which constituted a basic part of the consideration for the execution thereof. Sharp testified: "I know the restriction was not an afterthought, because Weingarten's wouldn't sign the lease until the restrictions were signed first. I remember that."

In Patrizi v. McAninch, 1954, 153 Tex. 389, 269 S.W.2d 343, the Court refused to eliminate from the contract the illegal portion thereof which was in violation of the anti-trust laws of Texas, saying:

"If a party may thus eliminate parts of an agreement which may well have been the vital and inducing cause for its execution by the other party, the while retaining the right to enforce the consideration for the eliminated parts,

the antitrust laws will become a hollow symbol of a dead era.

" * * *

"It is our opinion that under the only reasonable construction of all the provisions of the contract, the royalty payments and the illegal restrictions contained in paragraphs 2 and 5 are so interdependent and indivisible that they cannot be separated and must fall together."

■ Appellee vigorously contends that there can be no violation of the anti-trust laws of this State in the instant case, since Sharp completely ran, dominated and controlled Center Corporation, which was his alter-ego, and before a combination becomes unlawful the persons to the combination must be independent and capable of competing with each other. Gates v. Hooper, 1897, 90 Tex. 563, 39 S.W. 1079; State v. Fairbanks-Morse & Co., Tex.Civ.App.1951, 246 S.W.2d 647, writ ref., n. r. e. In this connection appellee asserts that Sharp set up Center Corporation as well as the two trusts for his daughters, for their benefit, and that it would be absurd to think that such corporation would enter into effective competition with Sharp or he with the corporation.

We do not agree with this contention. All of the stock in Center Corporation was owned by the two irrevocable trusts which had been established for Sharp's daughters with Bank of the Southwest as trustee. It is true that the trustee generally approved sales and leases and other transactions recommended to the trustee by Sharp or his righthand man, Tucker. It is equally true, however, that Center Corporation was not required to follow their recommendations or suggestions with respect to such business matters. The testimony shows that the Bank never abandoned its responsibility as trustee although it did not usually administer the properties of the corporation held in the trust as ordinarily done in the case of trust property. The properties of the Cor-

poration were administered by the corporation. The owners of the corporation stock were Sharp's two married daughters, but such stock constituted assets of the two trusts, and was held in trust by the Bank as trustee. Sharp was not a stockholder, officer or a director of Center Corporation, nor did he have any right to control such corporation or the irrevocable trusts. The affairs of the Corporation were managed through its officers and directors who were mainly officers of the trustee Bank. While the corporation seems to have cooperated with Sharp and he with the corporation, there was nothing to keep them from competing. Indeed, had Sharp undertaken some project that would have been detrimental to the trusts that owned the corporate stock of Center Corporation, the trustee would not only have had the power but it would have been its duty to compete with Sharp for the protection of the trust property. Sharp himself testified at the trial that the controlling stock of Center Corporation was in the Bank of the Southwest as trustee which operated under a trust indenture executed by him and his wife, and that the trusts were irrevocable trusts which gave the Bank, in its capacity as trustee, control of the corporation. Mr. Weintraub, Vice President of Center Corporation, acknowledged in his deposition that the Bank as trustee had the right to make the decisions for the trust, and that the Bank acted as trustee and never abandoned its responsibility as such.

It is our view that Sharp never had any "property interest" in Center Corporation, the leasehold or the Kroger tracts. By reason of his affection for his daughters he naturally had an interest in the welfare of Center Corporation and in the trusts and in the development of Oak Forest Addition generally. He had guaranteed payment of a large note executed by Center Corporation and he and his wife had lent money to the corporation. This, however, did not give him a property interest in the corporation or in the property of the corporation. Not until a default should occur in the payment

of such note, and Sharp is required to make good his guarantee of payment, will he become subrogated to the foreclosure rights of the mortgagee or acquire any sort of property interest in the corporation's property.

■ Appellant asserts that the trial court also erred in finding and holding that Realty Corporation was the alter-ego of Sharp, since there is no basis for disregarding the corporate entity. At the time the Weingarten lease was executed Realty Corporation owned the northeast quadrant in the shopping center and possibly other tracts within the two mile circle. The main purpose for having Sharp and Realty Corporation execute the separate restrictions instrument was to prevent competition by Sharp whether he operated individually or through a corporation. It is our view that the court's finding that Realty Corporation was Sharp's alter-ego finds no support in the meager evidence concerning Realty Corporation. Sharp testified that Realty Corporation was a Texas corporation solely owned by him. He signed the restrictions agreement for such corporation, but believes that there was a directors' meeting authorizing it. The directors of the corporation were Sharp and two of his employees. It is possible, of course, that the employee-directors were mere puppets of Sharp who followed his directions to the letter. However, we find no evidence to such effect. The fact that Sharp owned all of the stock in Realty Corporation did not in itself make such corporation his alter-ego. Trott v. Flato, Tex.Civ.App., 244 S.W. 1085, 1088; Moroney v. Moroney, Tex.Com.App.1926, 286 S.W. 167, 169; State v. Swift & Co., 1945, 187 S.W.2d 127, writ ref.; Commonwealth of Mass. v. Davis, 1942, 140 Tex. 398, 168 S.W.2d 216.

While it was probably unlikely that Realty Corporation and the trusts would compete, they were not incapable of competition. There was nothing to prevent the harmonious relationship between the trustee and Realty Corporation from terminating in the event Realty Corporation undertook to engage in some transaction detrimental to the trust estate. Even the closest family relations have been known to deteriorate in disputes over property. The trustee was under a duty to take competitive or other proper action against Realty Corporation, in the same manner as in the case of Sharp, in the event such action became necessary, for the protection of the trust property and its owners.

In view of our holding, the question as to whether Kroger had actual and constructive notice, or either, of the restrictions before signing the lease, has become academic. We are of the opinion, without regard to constructive notice, that the court's finding of actual notice is amply supported by the evidence.

It is our opinion that if it were not for the illegal combination and conspiracy of the parties which brought the properties of Sharp and Realty Corporation within the operation of the restrictive covenants contained in the lease, the trial court's finding in its judgment that such covenants are reasonable as to both time and place, would find sufficient support in the evidence.

The judgment of the trial court is reversed and the injunction granted by it is dissolved and set aside.

Reversed and rendered.

On Motion for Rehearing

Appellee has very forcefully urged that the restrictions agreement incorporated into the lease, if in violation of the anti-trust laws of Texas, may be stricken from the combined agreement in order to keep the entire lease from being void, and that the remainder of the contract can then be enforced since the portion of the contract violating the anti-trust laws is severable under the facts of this case. Appellee has cited many authorities, mostly out of state, in support of its contention. It has also undertaken to distinguish this case from the case of Patrizi v. McAninch, 153 Tex. 389, 269 S.W.2d 343, cited in the above opinion.

Judge Wilson, in his concurring opinion in the Patrizi case, indicates that the court in the majority opinion holds that a contract containing some clauses violating the anti-trust laws and also containing a "saving clause" that the parties do not intend to violate the anti-trust laws is not "absolutely void" and therefore "not enforceable, either in law or equity", but on the contrary the portions violating the anti-trust laws may be stricken and the remainder of the contract enforced if severable. We have re-examined the Patrizi case and are unable to find in the majority opinion any holding to such effect. The court arrived at the conclusion that the contract relied upon by plaintiff was in violation of Article 7426, V.A.T.S., and that the provision for royalty payments and the illegal provisions were indivisible and inseparable. The majority opinion makes no express mention of Article 7437, V.A.T.S., but it does refer to "Art. 7426 et seq." Article 7437 reads as follows:

"Any contract or agreement in violation of any provision of this sub-division shall be absolutely void and not enforceable either in law or equity."

We are of the opinion that Article 7437, V.A.T.S., means exactly what it says, and that this Court must recognize such provision. In 12 Am.Jur., p. 738, Sec. 220, it is stated:

"The rule with respect to agreements in violation of statute has been declared to be that if any part of an agreement is valid, it will avail pro tanto, though another part of it may be prohibited by statute, *provided the statute does not, either expressly or by necessary implication, render the whole void* and provided the sound part can be separated from the unsound and enforced without injustice to the defendant." (emphasis supplied)

The combined agreement, which is the agreement sued upon by appellee, is in violation of the anti-trust laws of this State, and such contract is expressly rendered void and unenforceable by Article 7437, V.A. T.S.

We note also that in the Patrizi case the Supreme Court quoted with approval the following language in Wegner Bros. v. Biering & Co., 65 Tex. 506, 509, 510, 512:

" 'It is obvious that there is ample valid consideration to support the promise sued on; yet, if, to the abundance of valid consideration, there has been added a leaven of what is illegal, the whole contract is tainted.

" ' * * * The whole cannot be enforced, because the law will not compel what it prohibits, and the parts can not be separated. Illegality thus vitiates the entire instrument.

" ' * * * The purpose of the law is to discountenance and discourage improper contracts; not to enforce them is adopted as the best means to this end, and is adopted in total disregard of the effect upon the parties to the prohibited transaction.' "

■ It is undisputed in this case that the restrictions agreement was one of the chief inducements that persuaded appellee to enter into the lease. The record clearly shows that but for the execution of the restrictions agreement, appellee would not have entered into the lease agreement. Appellee agreed to pay rents, not only in consideration of Center Corporation conveying to it an interest or estate in realty for a term of years, but also in consideration of the promise on the part of Center Corporation, Sharp and Realty Corporation to restrict not only the property belonging to Center Corporation but also the property belonging to Sharp and Realty Corporation for the entire period of the lease. It is clear that the restrictions agreement was a vital part of the consideration for the execution by Weingarten of the lease in question. Where a contract sued upon is invalid under our anti-trust statutes, recovery by either party as against the other will be denied. Vann v. Toby, Tex.Civ.App., 260 S.W.2d 114, writ

ref., n. r. e. See also Fred Miller Brewing Co. v. Coonrod, Tex.Civ.App., 230 S.W. 1099, error ref.; Gray v. Kaliski, Tex.Com. App., 45 S.W.2d 157; Morrison v. City of Ft. Worth, 138 Tex. 10, 155 S.W.2d 908; Continental Fire & Cas. Ins. Corp. v. American Mfg. Co., Tex.Civ.App., 221 S.W.2d 1006, writ ref.; Mercury Life & Health Co. v. Hughes, 271 S.W.2d 842, writ ref.; Loggins v. Stewart, Tex.Civ.App., 218 S.W.2d 1011, writ ref.

In our original opinion we concluded that there was no evidence that Realty Corporation was the alter-ego of Sharp or that it was controlled by him. On reviewing the record we have concluded that the trial court's finding that Realty Corporation was Sharp's alter-ego and that he had absolute control over such corporation, finds support in the testimony and legitimate inferences therefrom. This, however, does not result in any change in our opinion since we are still of the view that Center Corporation as a matter of law was not the alter-ego of Sharp. Thus there were at least two parties capable of executing an agreement that would prevent competition in violation of Article 7426, V.A.T.S.

Although Sharp was interested in the success and welfare of Center Corporation because of his affection for his daughters and also because of the money that he had lent it, and further by reason of his guarantee of the large note executed by Center Corporation, he had no legal control over such corporation or property interest therein. He acted for the corporation in various business matters and the corporation usually stamped its approval on what he did. In one sense he acted as an agent of the corporation in various transactions having to do with the property belonging to the corporation. He did not, however, act as an agent of the corporation with respect to his own property or that of Realty Corporation, nor did he act as an agent for Center Corporation when it executed by its vice president, Mr. Weintraub, the lease and the restrictions agreement. These facts distinguish the present case from those cases cited by appellee in its brief in support of its motion for rehearing, in effect holding that where an agent represents two or more corporations, there can be no illegal trust or conspiracy because of lack of parties.

Motion for rehearing overruled.