Fred BARON, d/b/a House of Fabrics,
Appellant,

v.

The CROSSROADS CENTER OF IOWA,
INC., and the Singer Com-
pany, Appellees.

No. 53183.

Supreme Court of Iowa.

March 11, 1969.

Alan Loth, Fort Dodge, for appellant.

Johnson, Burnquist, McCormick & Erb, Fort Dodge, and David Stanley, Minneapolis, Minn., for appellee, Crossroads Center of Iowa, Inc.

Mitchell, Mitchell, Murray & Goode, Fort Dodge, and Parker & Parker, Minneapolis, Minn., for appellee, The Singer Co.

BECKER, Justice.

Plaintiff seeks a declaratory judgment to interpret specific portions of his lease with defendant Crossroads Center of Iowa, Inc., adjudication of his rights against both Crossroads and defendant The Singer Company, another lessee at the shopping center, and asks injunctive relief. The trial court determined plaintiff's rights had not been violated and dismissed the petition at plaintiff's costs. Plaintiff appeals. We reverse and remand.

Defendant Crossroads owns and operates a shopping center in or near Fort Dodge, Iowa. The center has 32 tenants, including at least four large store operators, Sears Roebuck, Penneys, Woolworths and Younkers. Plaintiff is a tenant by virtue of a lease negotiated during the summer of 1965 and dated August 2, 1965. Plaintiff went into possession and commenced operation of his store February 15, 1966.

Defendant Singer is a tenant by virtue of a similar lease dated February 9, 1967. The Singer Company store commenced operation July 1, 1967. Plaintiff contends Singer's operation violates the restrictive covenants contained in plaintiff's lease and seeks the relief referred to above.

## PLAINTIFF BARON'S LEASE

Gerald Schoenfelter, President of Crossroads testified he, with the help of legal counsel, developed the form lease applica-

ble to most of the areas leased at the center. The leases are necessarily long and complicated. They provide for terms of occupancy, renewal options, base rental with percentage rent over a computable amount, restrictions on assignments and subletting and for a great many other problems that may be expected to arise over the years of long term leases.

Crossroads' lease provides for a 10-year term, five percent of the gross as rent with a minimum of $675 per month. Baron is to construct the building to be occupied. The controversial clause in the Baron lease reads:

"XXVIII. EXCLUSIVE OPERATIONS. Except for the Demised Premises no part of Parcel 'B' shown on Exhibit 'A' shall be leased to any other tenant whose principal business is *the operation of a store selling fabric*. Throughout the term of this lease, and any renewals hereof, the Lessee shall operate on the Demised Premises and during all normal business hours when Shopping Center's tenants generally should be open for business, *a fabric store* and shall not carry on any other business on the Demised Premises. * * *" (The emphasized portions were typed. The rest was a mimeograph form.)

Prior to, and at the time of signing the lease, a letter was written by Baron to Crossroads, dated July 26, 1965 which has an acceptance by Crossroads, signed by its president, at the bottom also dated July 26, 1965. This letter reads in part: "2. In the aforesaid letter, the Lessor will further advise Mr. Baron of its intention that it shall not lease to any tenant whose principal business is an operation of store selling fabric in the area of Parcels D, D1 and C of the site plan that it maintains ownership or control. This is further understood not in any way to restrict the Lessor as to disposal of its ownership in the aforesaid property."

Our problem concerns the interpretation of the restrictive covenant in the lease itself because both stores are in Parcel "B".

We note the paragraph from the letter as indicative of the agreement between the parties.

## BARON LEASE NEGOTIATION

The facts and circumstances under which the Baron lease was negotiated, prepared and executed are the subject of considerable dispute. It is clear from the testimony of both parties that the instrument itself was prepared by defendant Crossroads both as to the mimeographed form and the typewritten insertions in the spaces provided. The parties had at least two conferences before the contract was signed.

Both parties agree nothing was said about the meaning of the phrase "whose principal business is the operation of a store selling fabric" when the contract was approved in final form. Mr. Schoenfelter, Crossroads' president, states he had earlier discussed the meaning of these words with Mr. Baron: "In this particular case, we explained that we would not enter into an additional lease, or any other lease, in the center with a tenant whose business would be the sale of fabrics as their principal business. Principal business being what they were leasing the space for and for really no other purpose other than incidentals. That was before signing. After signing I can't recollect any discussion about this lease until recent months.

"When we discuss the exclusive provision of this nature, we always point out the stores that are already in the business, or have a right to be in this business, or other stores that have a right to come into it as an incidental part of their business."

Mr. Baron's version of the discussion of the Exclusive Operations portion of the lease is quite different. He testified: "The only time other fabric business came up was in connection with other stores— Penney's was mentioned; Woolworths, Sears and the possibility of Younkers. And Mr. Schoenfelter asked me if I was familiar with the fact that these businesses

sell fabrics. I said I was; I had seen their operations. That is how it came up. * * *.

"In connection with the discussion of these four stores, there was no talk about there being any other stores to come later which would sell fabric, or would be competing with my business, or that they would be renting to other stores that incidentally sold fabrics." On cross-examination he stated: "There is no doubt in my mind that this is understood to mean any store selling fabrics; otherwise I wouldn't be here today. Not 'whose principal business is selling fabrics'; no."

Mr. Grossman, Baron's attorney, said he was present at the conference when the terms were finally agreed upon. It was at that time he dictated the letter dated July 26, a portion of which we set out above. He too states there was no discussion of the meaning of the phrase "whose principal business is the operation of a store selling fabrics". The phrase was in the lease when it was brought to him. He testified without objection: "I looked on there at the exclusive operation and I saw typed in what we're going to give him exclusively, and typed in were the following words: 'the operation of a store selling fabrics.' Now I thought that anything that restricts the shopping center from having a business in the operation of a store selling fabrics meant what it said—that no store could open up that sold fabric. I felt that protected him."

Much more was said by both parties. We think the above excerpts are sufficient to show the lessor and lessee differed in their interpretation of the language. The real factual conflict appears when Crossroads insists it explained to Baron its intention to allow competition by other subsequent tenants as an incidental part of such tenant's business. Baron denies this but admits he knew of and expected competition from the four large stores who already had leases or whose lease was being negotiated. (Younkers).

## SINGER'S LEASE

The same form was used for the Singer lease. It reads in part: "Except for the Demised Premises, no part * * * shall be leased to any tenant whose principal business is *the operation of a sewing center or the sale of sewing machines.* * * * Lessee shall operate on the Demised Premises * * *, *a store for the business of the sale and display of sewing machines, electrical appliances, notions and repair, servicing and storage of such and similar merchandise and for the rendering of sewing and related services and the conducting of a Singer Sewing Center, with Fabric and shall not carry on any other business on the Demised Premises.*

"It is further agreed that during this lease term and any renewal thereof Lessee may engage in the merchandising and sales of fabrics as an incidental part of its overall operation in the demised premises but may not engage in sales of fabrics as its principal business in the demised premises." (The emphasized words were typed.)

## BARON'S OPERATION

Plaintiff Baron testified he had never operated a fabric shop before but his father had operated such a store and he grew up in the fabric business. Mr. Baron had previously been operating a headwear jobbing business in Minneapolis. He testified "fabric" includes notions, patterns, trimming and related items as well as yard goods and bolts of cloth and he sells only the articles mentioned as his lease requires. He provided gross sales figures on a monthly basis from February 15, 1966 through December 1967. The figures show substantial increases each month compared with the month in the prior year; and total sales for 1966 at $77,590 and for 1967, $149,067. The 1967 gross was still not high enough to be equal to the base rent at five percent as provided in the lease. Plaintiff claims the month-by-month figures show a drop in comparative increase from 98% in the second quarter of 1967

over the second quarter of 1966, to 80% in the third quarter of 1967 after Singer started July 1, 1967, to 69% in the last quarter of the year.

## SINGER'S OPERATION

Under the lease Singer began selling fabrics as part of its business on July 1, 1967, the date it opened for business. Advertising specifically and solely related to the sale of fabrics was introduced in evidence. Although reference was made to advertising of sewing machines and other articles offered for sale by Singer, the record contains no information as to the extent or type of such advertising of other parts of the business. Pictures showing use of the great majority of the store-front window space for fabric display were introduced into evidence. The pictures and a floor plan for the Singer store show they devote one-half of the front of the store to merchandising fabrics; and part to the sale of appliances, radio and television and to Singer sewing machines. Most of the rear is devoted to a sewing school.

Mr. Hudson, manager of Singer, called as an adverse witness and also testifying for Singer, showed the store to be divided into what essentially amounted to five departments, (1) sale of sewing machines with a parts department; (2) a home entertainment department which sells television sets, stereos, phonographs, vacuum cleaners and records; (3) a fabric department; (4) a notions department (zippers, tapes and the like); and (5) a sewing class department. Total gross income for the Singer store was furnished for the period July 8, 1967 to December 23, 1967 which indicated gross sales of $88,700 of which fabric sales (not including notions) accounted for $15,600. Mr. Hudson strongly maintained Singer's principal business was selling sewing machines. Sales of all other products are simly a means "to get the people in our store so that we can demonstrate."

With this background, we are asked to determine the rights of the parties under the contract.

I. This is a shopping center lease. The recent growth of shopping centers, their size, complexity, economic importance and the difficulty of handling draftsman problems relating to preparation of contracts in connection therewith have spawned a school of cases dealing with such contracts, especially leases. Legal scholars and active legal practitioners have attempted both analysis and guidance in the field. Note, 53 Harvard L.Rev. 1400 (1950); Note, 34 New York U.L.Rev. 940 (1959); Symposium 1965 U. of Illinois Law Forum, 173 et seq. We mention our awareness of this economic development primarily as a factor to be considered in construing the contract. We must still decide the matter in accord with the accepted canons for construction of contracts. In the many cases examined concerning shopping center leases we found no new canons applying only to shopping centers and no approach other than those canons of construction used for interpretation of contracts generally.

II. Defendants urge the covenant must be strictly construed against the covenantee. The trial court's conclusion of law on this point was: "The law says that restrictive covenants in leases must be strictly construed. 51 [51C] C.J.S. Landlord and Tenant Section 238." We are not among the courts subscribing to that statement.

In Uptown Food Store, Inc. v. Ginsberg, 255 Iowa 462, 467, 123 N.W.2d 59, 1 A.L. R.3d 765, we considered a lease containing a covenant on the part of lessors not to compete with lessees. After noting several cases where we have said: "The contract being in restraint of trade is to be strictly construed", we then quoted Sickles v. Lauman, 185 Iowa 37, 45, 169 N.W. 670, 673, 4 A.L.R. 1073, as follows: " 'In discussion, courts sometimes indulge in the loose generality that the law does not favor contracts in restraint of trade, and therefore an agreement by which a party undertakes

not to enter a specific business in a specified city or town will be strictly construed. What the law does disfavor are contracts which unreasonably restrict the individual in his liberty of occupation and employment. But there is no public policy or rule of law which condemns or holds in disfavor a fair and reasonable agreement of this character, and such a contract is entitled to the same reasonable construction and the same effective enforcement that are accorded to business obligations in general.'

"The above from the Sickles case places the construction of the contract in this case in proper perspective. It is not contended the contract is unreasonable as to size of the restricted area, the time element, service performed by covenantor, or the general circumstances involved."

At 97 A.L.R.2d 4, an exhaustive annotation covering validity, construction and effect of such covenants may be found. Early in the annotation at page 11 the annotator observes: "But even though the covenant is valid, some courts hold that it is to be strictly construed. In contrast, other courts are willing to interpret the covenant with greater liberality, placing emphasis upon the intention of the parties and the purpose of the covenant." Uptown Food Store, Inc. v. Ginsberg, supra, places us among the courts adhering to the latter rule. Cf. Stockdale v. Lester, Iowa, 158 N.W.2d 20, 22. For cases generally taking the view adopted here see Carter v. Adler, 138 Cal.App.2d 63, 291 P.2d 111; Slice v. Carozza Properties, Inc., 215 Md. 357, 137 A.2d 687; Cragmere Holding Corporation v. Socony-Mobil Oil Co., 65 N.J.Super. 322, 167 A.2d 825; Parker v. Lewis Grocer Co., 246 Miss. 873, 153 So.2d 261; Gillen-Crow Pharmacies Inc. v. Mandzak, 5 Ohio St.2d 201, 215 N.E.2d 377; Bevy's Dry Cleaners & Shirt Laundry, Inc. v. Streble, Ohio App., 194 N.E.2d 595; Utica Square, Inc. v. Renberg's Inc., Okl., 390 P.2d 876; Contra, Flanagan, Beck & Koeppel Enterprises, Inc. v. Speno, 41 Misc.2d 262, 245 N.Y.S.2d 569; Winter

Park Appliance Center, Inc. v. Walling Crate Co., Fla., 196 So.2d 198; Norwood Shopping Center, Inc. v. MKR Construction Corp., Fla.App., 135 So.2d 448, 97 A.L.R.2d 1; Nevada Food King, Inc. v. Reno Press Buick Co., Nev., 400 P.2d 140; Kroger Company v. J. Weingarten, Inc., Tex.Civ.App., 380 S.W.2d 145; Great Atlantic & Pacific Tea Co. v. Bailey, 421 Pa. 540, 220 A.2d 1.

■ III. Rules of construction are applicable only where the words are susceptible to interpretation; i. e., where they may reasonably be given more than one meaning. As is so often the case, both parties claim this covenant is clear and unambiguous; susceptible of only one meaning and not open to construction. Despite this unanimity both reach diametrically opposite results in applying the clear and unambiguous words. The posture of the parties once again underlines the necessity for consideration of surrounding circumstances to aid in interpreting the words used. This subject was extensively discussed in Hamilton v. Wosepka, 261 Iowa 299, 154 N.W.2d 164. The principles recognized there are applicable here and the evidence of surrounding circumstances was admissible under Hamilton v. Wosepka, supra.

The subjective interpretation of the contract testified to by the various parties was also admitted, much of it without objection. We consider this evidence proper under the rule recognized in City National Bank of Columbus, Ohio v. Jordan, 139 Iowa 499, 503, 117 N.W. 758, 760: "* * *. It is true in a certain sense that, in saying he entered into the purchase because of or in reliance upon the representations made to him by the seller, the defendant is testifying to a conclusion, and perhaps, to one of the ultimate matters of fact involved in the controversy, but this is by no means conclusive of the inadmissibility of evidence. Whenever motive or intent or the reasons operating to induce a given action by a party are material considerations in determining rights involved in any litigation, it is competent for such

party to testify thereto; and the fact that such testimony may partake of the nature of an opinion or a conclusion, or may relate to some ultimate fact or facts upon which the jury must pass in reaching their verdict, works no exception to the rule." This rule is recognized in Colburn v. Krabill, 232 Iowa 290, 292, 3 N.W.2d 154; Pooley v. Dutton, 165 Iowa 745, 749, 147 N.W. 154; 3 Corbin on Contracts, section 543, pages 130, 141 et seq.; Cf. Cragmere Holding Corp. v. Socony-Mobil Co., 65 N. J.Super. 322, 167 A.2d 825.

The key phrase here is Crossroads' covenant in Baron's lease to refrain from leasing shopping center space to "any tenant whose principal business is the operation of a store selling fabric." The language used, the surrounding circumstances and the subjective understanding of the parties, especially Baron and his attorney Grossman, control the result here. Section 622.-22, Code of Iowa, 1966 reads: "Understanding of parties to agreement. When the terms of an agreement have been intended in a different sense by the parties to it, that sense is to prevail against either party in which he had reason to suppose the other understood it."

Baron and Grossman testified the words used were understood by them as complete protection from all additional competition in the fabric line. From the literal meaning of the words selected by Crossroads, for use in Crossroads' form lease, Baron's and Grossman's inference was permissible.

The key phrase is, of course, susceptible to the meaning given it by Crossroads. It is arguable the phrase was designed to prohibit leasing only to tenants whose principal business was fabrics and not to prohibit all future tenants from selling any fabric. This interpretation is strengthened by the extensive prior negotiation and by other leases some of which were designed to prohibit *all* competing sales and some of which were designed to protect a lessee from a future lease to a tenant whose principal business consisted of competing sales.

Here there were prior leases to stores with fabric departments and the lease used the language of a limited exclusive: "principal business."

■ This interpretation, it is immediately apparent, in effect deletes the phrase "the operation of a store" and the covenant reads "whose principal business is selling fabrics." This interpretation is impermissible because, as both parties agree, the contract must be read as a whole so as to give effect to all of its terms. State v. Sprague, 225 Iowa 766, 281 N.W. 349. In Baron's lease Crossroads used the term "whose principal business is the operation of a store selling fabric" but in Singer's lease the phrase "whose principal business is * * * the sale of sewing machines." There is an additional phrase in Baron's lease and it must be given meaning.

Defendants argue the additional term "the operation of a store" does not change the meaning of the covenant because all tenants in the shopping center operate stores and Singer's principal business is operating a store selling sewing machines not operating a store selling fabrics. Therefore, they assert, Singer should be allowed to sell fabrics as an incidental part of its business.

It is equally reasonable and more persuasive in the light of the surrounding circumstances to read the words "principal business" in reference to "operation of a store" rather than "selling fabrics". Thus Singer operates a store; the store sells fabric and that is the very thing Crossroads is forbidden by Baron's covenant to do.

■ If only the words "whose principal business is selling fabrics" had been used Singer could sell fabrics if such sales were not its principal business. However, when the words "whose principal business is the operation of a store selling fabrics" are used the phrase "operation of a store" may be interpreted as a negative phrase which prohibits a lease to any other tenant for

the operation of a store selling fabrics. The term "principal business" is thus effectively negated as a modifier of "selling fabrics". Otherwise use of the term "operation of a store" has no meaning.

In this connection it is worth noting that the words "principal business is" are part of the mimeograph form; "the operation of a store selling fabric" is typed in at the space provided. The typed words control, or at least modify, the printed or mimeographed words used in the form. (Code section 622.21, 1966.) The rule is peculiarly applicable here. Baron could reasonably assume the typed words were chosen by the scrivener (Crossroads) by design to nullify the printed words "principal business" as relating to selling fabric and to relate it to a store selling fabric. Stebens v. Wilkinson, 249 Iowa 365, 371, 87 N.W. 2d 16, 71 A.L.R.2d 277; Commercial Natl. Bank of Charles City v. May, 187 Iowa 888, 893, 894, 174 N.W. 646; Low v. Young, Mullarky and Long, 158 Iowa 15, 17, 138 N.W. 828; Sylvester v. Ammons, 126 Iowa 140, 142, 144, 1011 N.W. 782. Cf. section 554.3118(b), Code, 1966.

Corbin says: "When the terms of a written contract have been chosen by one of the parties and merely assented to by the other, this fact will in some cases affect the interpretation that will be given to these terms by the court. After applying all of the ordinary processes of interpretation, including all existing usages, general, local, technical, trade, and the custom and agreement of the two parties with each other, having admitted in evidence and duly weighed all the relevant circumstances and communications between the parties, there may still be doubt as to the meaning that should be given and made effective by the court. This doubt may be so great that the court should hold that no contract exists. If, however, it is clear that the parties tried to make a valid contract, and the remaining doubt as to the proper interpretation is merely as to which of two possible and reasonable meanings should be adopted, the court will adopt that one which is the less favorable in its legal effect to the party who chose the words." 3 Corbin on Contracts, section 559, page 262.

In Modern Heat and Power Co. v. Paul, Iowa, 158 N.W.2d 8, 10, we again recognized this basic principle in a proper case: "* * *. The contract is vague and unclear in this respect. We have often held ambiguities appearing in written contracts are to be construed against the author of the instrument." (cases cited). In this case we have no doubt about who prepared the printed form and who chose the words to be inserted into the contract at the spaces provided. Both parties agree Crossroads controlled the choice of form and insertion of typewritten specifics. The evidence does not show sufficient discussion to charge both parties with choice of the words used.

Both sides claim the other should have insisted upon language that more clearly delineated their intention. The trial court observed: "If he (Baron) wanted future tenants prohibited from selling fabrics in competition with him the applicable language could easily have been inserted in the lease." The same observation, to converse effect and with more cogency, could be made of the position of defendant Crossroads. Crossroads prepared the lease and created the impression Baron was protected.

IV. The record shows defendant was dealing in two types of leases; i. e., what are referred to as "true exclusives" and "limited exclusives". Such practice is recognized in the legal literature on the subject and is borne out by many of the multitude of recent cases where the courts have had to wrestle with the terms used in shopping center leases. For cases involving what might be called "true exclusives" see: Gillen-Crow Pharmacies, Inc. v. Mandzak, 5 Ohio St.2d 201, 215 N.E.2d 377; Hildebrand v. Stonecrest Corp., 174 Cal.App.2d 158, 344 P.2d 378; Cragmere Holding Corp. v. Socony-Mobil Oil Co. Inc., 65 N.J.Super. 322, 167 A.2d 825.

For cases involving "limited exclusives" see: Norwood Shopping Center, Inc. v. MKR Construction Corp., Fla.App., 135 So.2d 448, 97 A.L.R.2d 1; Utica Square, Inc. v. Renberg's, Inc., Okl., 390 P.2d 876; Friedman Textile Co. v. Northland Shopping Center, Inc., Mo.App., 321 S.W.2d 9.

In Norwood Shopping Center v. MKR Construction Corp., Fla.App., 135 So.2d 448, 97 A.L.R.2d 1, the words used show much more clearly a limited exclusive privilege was intended and granted. Similarly, where a truly exclusive right was intended, clearer language was used in Cragmere Holding Corp. v. Socony-Mobil Oil Co. Inc., 65 N.J.Super. 322, 167 A.2d 825. Even so, litigation arose resulting in the reported cases.

■ Our study of the language in the lease in light of all of the surrounding circumstances under which it was negotiated impels us to conclude the restrictive covenant Crossroads placed in Baron's lease is to be construed as a true exclusive which prohibited Crossroads from granting leases to any tenants other than those who already had leases (plus the lease to Younkers about which both parties were informed) for the purpose of operating a store that sold fabrics. Those parts of Singer's lease which allowed sale of fabrics as an incidental part of Singer's business were therefore in violation of Baron's lease.

V. Plaintiff is entitled to the injunctive relief he asks unless there is some other equitable or legal reason why the relief should be denied. Singer claims Baron has no case against it because Baron's lease is unrecorded and there is no showing Singer had actual or constructive notice.

■ Baron's reply to this contention is that it has been raised for the first time on appeal, lack of notice was neither pleaded nor proved at the trial level as is required by our prior cases, and the circumstances surrounding the negotiation of the Singer lease put them on inquiry as to Baron's

rights. We conclude plaintiff is right in these contentions.

■ If Singer wished to rely on the defense that it was a good faith purchaser (lessee) without notice, it was necessary for it to plead and prove such defense. Loranz & Co. v. Smith, 204 Iowa 35, 214 N.W. 525, 53 A.L.R. 662; Wilson v. Kelso, 250 Iowa 67, 74, 92 N.W.2d 392. These cases deal with chattel mortgages but the same rule has been applied to transactions involving real estate. Blackman v. Henderson, 116 Iowa 578, 87 N.W. 655; Johnson v. Chicago, B. & Q. R. Co., 202 Iowa 1282, 211 N.W. 842.

We find nothing in the record indicating Singer claimed at trial that they were without notice of the contents of Baron's lease. Such an issue cannot be raised for the first time on appeal.

Although we hold the above procedural failures are determinative of this defense we also note plaintiff's argument that Singer had what has been termed "inquiry notice." United States v. Cedar Val. Livestock Exchange, D.C., 169 F.Supp. 169. In Johnson v. Chicago B. & Q. R. Co., supra, we said: "It is a well-established principle that notice is either knowledge or having means of knowledge, although such means may not be used. One who purchases land, with knowledge of such facts as would put a prudent man upon inquiry which, if prosecuted with ordinary diligence, would lead to actual notice of rights claimed adversely by another, is chargeable with the actual notice that he would have received.

"There is a notice which may be termed implied, although it does not include either positive knowledge or information so direct as to carry conviction to the mind of the person notified. In a strict sense, it is different from constructive notice, which it greatly resembles. However, constructive notice is a creature of positive law, and rests upon strictly legal inference. Implied notice arises from inference of fact, but it may be said that both have the same legal

effect. See Cooper v. Flesner, 24 Okl. 47, (103 P. 1016, 23 L.R.A.,N.S., 1180, with note)." (202 Iowa at pp. 1288, 1289, 211 N.W. at p. 846.)

■ Crossroads' lease with Singer contained clauses which (1) forbid filing the lease before possession was taken, (2) forbid Singer from subleasing "for the purpose of operating any business which would conflict with 'noncompetitive' or 'exclusive' provisions specifically enumerated in other leases" (3) contained a plat specifically designating the premises two doors away from Singer's location as "House of Fabrics", a field Singer clearly intended to invade with a special department. Under these facts we hold Singer was put on inquiry. Indeed, they do not testify they did not inquire and they do not testify they had no actual knowledge of the terms of Baron's lease. The defense of an innocent lessee in good faith is without merit.

■ VI. Crossroads offered an interoffice memorandum in evidence. This memo included the following: "8. Type of store to be operated: Fabric Store. 9. Nature of exclusive rights to be granted: Only exclusive fabric store in center." Baron objected to the admission of the exhibit stating it was hearsay as to Baron and not binding on him. Both sides cite Shell Oil Co. v. Kelinson, Iowa, 158 N.W. 2d 724 to sustain their position in relation to the memo. Shell Oil Co. v. Kelinson, supra, did not pass on the admissibility of the undisclosed interoffice communication as such, but held the communication was insufficient to tip the balance in favor of the offerer of the exhibit. We reach the same conclusion here.

The memorandum, in light of all of the circumstances considered here, especially the existence of four stores that both parties agree could sell fabrics, is not inconsistent with the interpretation urged by Baron. The exhibit cannot change the result.

■ VII. As part of its declaratory judgment plaintiff asks us to determine his right to sue for damages. He made no claim for damages to time of trial and introduced no evidence in support of any specific amount. Rules 261 and 262, R.C.P., permit such an action.

Orkin Exterminating Co., Inc. v. Burnett, 259 Iowa 1218, 1229, 146 N.W.2d 320, 327, involved a requested injunction based on a covenant not to compete and a prayer for damages. It was not a declaratory judgment action. We reversed and ordered the injunction issued. As to damages we said: "* * * we feel there was substantial evidence of some damage to plaintiff by defendant's acts after the termination of his employment with plaintiff, and believe the case should be remanded for a determination thereof."

Plaintiff was not required to establish specific damages to be entitled to an injunction. Uptown Food Store, Inc. v. Ginsberg, 255 Iowa 462, 467, 123 N.W.2d 59, 1 A.L.R.3d 765. He could and did, as a part of his declaratory judgment action, establish his right to sue for damages in a separate action.

■ VIII. Finally, defendants contend the injunction should not be granted because Singer's lease was signed before this action was commenced. We find no merit in this contention. Baron notified Singer of his position promptly after he discovered the defendant's intention. The letter of notification was sent after the Singer lease was signed but two months prior to the time Singer commenced selling fabrics. This action was commenced on June 5, 1967 more than three weeks before the Singer opening. As to knowledge at the date of signing the lease we have said Singer was charged with inquiry notice. This will not be an injunction that requires Singer to go out of business. It simply requires it to cease selling fabrics in violation of plaintiff's contractual rights.

This case must be and is hereby remanded to the trial court for entry of declarato-

ry judgment and injunctive relief consistent with this opinion.

Reversed and remanded.

All Justices concur, except RAWLINGS, J., who concurs in the result and MOORE and LeGRAND, JJ., who dissent.

MOORE, Justice.

I respectfully dissent.

Various rules of law are discussed in the majority opinion but it is obvious the decision turns upon one rule applicable to the interpretation of contracts plagued with ambiguous terminology. That rule is, when a court has exhausted all legitimate avenues of approach and ordinary processes of contractual interpretation and yet remains dubious as to the parties' intended meaning, then it should adopt that meaning which is less favorable in the legal effect to the parties responsible for the words chosen. I do not disagree with this general rule but the facts presented here do not justify its application.

The crucial phraseology upon which a proper disposition of this controversy depends reads: "Exclusive Operations. Except for the Demised Premises no part of Parcel 'B' shown on Exhibit 'A' shall be leased to any other tenant whose principal business is the operation of a store selling fabric." Plaintiff contends, and the majority holds, that the phrase absolutely prohibits the sale of any fabric by any store in the shopping center which has entered into a lease agreement with Crossroads subsequent to his lease. I am unable to read this phrase as expressly or impliedly affording such a blanket prohibition.

The majority observes that the phrase "the operation of a store" does not appear in Singer's lease and asserts this omission imparts some peculiar meaning to that phrase as used in Baron's lease. Consideration of this omission as bearing on a proper interpretation of Baron's lease is impermissible as Singer's lease was admittedly executed eighteen months after Baron's. The issue here is what may reasonably be interpreted to have been the intent of the parties when Baron's lease was executed. Such a determination must be based on the language and circumstances surrounding the execution of Baron's lease, not on the fact a subsequent lease granted to a third party did not contain a phrase which was inserted in Baron's lease.

In my opinion the language of the Baron lease is sufficiently clear and unambiguous to support defendant's position without resort to the application of an arbitrary rule of construction. The phrase reads "whose principal business is the operation of a store selling fabric". The word "principal" should be accorded its commonly understood meaning. The majority deletes the word in holding the restrictive covenant bars Singer from selling any fabric even though such sales may be incidental to its total sales volume. It holds the "principal business" requirement is met when Singer sells fabrics in excess of the nebulous de minimus standard.

I can reach no other conclusion after reading this phrase but that the parties agreed to permit the operation of a store whose principal volume of business does not derive from the sales of fabrics. Having reached this conclusion the focal point of inquiry is whether the sale by Singer of commodities other than fabrics constitutes its principal business. The record is undisputed that Singer's sale of fabrics did not exceed 17 percent of its business.

I would affirm the judgment and decree of the trial court.

LeGRAND, J., joins in this dissent.